# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT KNOXVILLE

## NOVEMBER SESSION, 1998

FILED

August 12, 1999

Cecil Crowson, Jr.
Appellate Court
Clerk

| | | |
|---|---|---|
| **DAVID LEE McNISH,** | ) | **C.C.A. NO. 03C01-9712-CR-00550** |
| | ) | |
| Appellant, | ) | |
| | ) | |
| | ) | **CARTER COUNTY** |
| **VS.** | ) | |
| | ) | **HON. JOHN K. BYERS,** |
| **STATE OF TENNESSEE,** | ) | **SENIOR JUDGE** |
| | ) | |
| Appellee. | ) | (Post Conviction—Death Penalty) |

## ON APPEAL FROM THE JUDGMENT OF THE CRIMINAL COURT OF CARTER COUNTY

FOR THE APPELLANT:

PAUL N. BUCHANAN,
Post-Conviction Defender
Staff Attorney
500 Deaderick Street
Nashville, TN 37243

MARK SLAGLE
302 Sunset Drive
Johnson City, TN 37604

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General and Reporter

MICHAEL E. MOORE
Solicitor General

PETER M. COUGHLAN
Assistant Attorney General
425 Fifth Avenue North
Nashville, TN 37243

DAVID CROCKETT
District Attorney General

H. GREELEY WELLS, JR.
Assistant District Attorney General
P.O. Box 526
Blountville, TN 37617

OPINION FILED _____

AFFIRMED

DAVID H. WELLES, JUDGE

# OPINION

The Defendant, David Lee McNish, appeals the decision of the trial court denying him post-conviction relief from his sentence of death for the premeditated first degree murder of the seventy-year-old victim, Gladys Smith. The facts presented at trial are reproduced below from the decision of the Tennessee Supreme Court on direct appeal affirming Defendant's conviction and sentence in State v. McNish, 727 S.W.2d 490 (Tenn. 1987). For the reasons set forth in this opinion, we affirm the trial court's denial of post-conviction relief.

In this appeal, Defendant argues eight primary issues: (1) the trial court denied Defendant's right to a full and fair hearing by improperly conducting the post-conviction proceedings; (2) the trial court erred by ruling that evidence of former Deputy Foster's prior convictions and concealment did not constitute material, exculpatory information within the knowledge and control of the State; (3) the trial court erred by precluding the testimony of Juror Archie Parlier at the post-conviction hearing because the testimony was admissible to show that the jury at trial was improperly influenced by extraneous information; (4) the trial court erred by ruling that trial and appellate counsel's prejudicial, deficient representation did not constitute a violation of Defendant's right to effective assistance of counsel; (5) the trial court erred by ruling that the heinous, atrocious, or cruel aggravating factor used in this case is constitutional; (6) death by electrocution is cruel and unusual punishment which violates the Eighth Amendment to the United States Constitution and Article I, Section 16 of the Tennessee Constitution; (7) the jury instruction at the penalty phase limited the

jury's consideration of mitigation, denying Defendant his right to individualized sentencing as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 6, 8, 9, and 16 of the Tennessee Constitution; and (8) the trial court erred by ruling that several issues raised in Defendant's post-conviction petition were waived.

The recitation of facts contained in the decision of the Tennessee Supreme Court on Defendant's direct appeal is consistent with the facts gleaned from a thorough review of the record in this case. Therefore, we summarize the court's findings here as follows:

> Mrs. Smith [the victim] lived alone in an upstairs apartment in the Lynnwood Apartments in Elizabethton, Tennessee. The parents of appellant had an apartment in the same complex of apartment buildings, as did Mrs. Selena Richardson (who was at that time Mrs. Selena Welch), whom appellant had been dating. [Appellant] testified that he was also a friend of the deceased and had been very attentive to her needs, frequently running errands for her and otherwise assisting her. . . .
> Since 1974 [Appellant] had used prescription drugs rather heavily because he suffered from headaches that grew out of injuries in an automobile accident during that year. He also testified that he purchased street drugs from time to time. Having little income, he sometimes borrowed a few dollars from friends, including Mrs. Smith.
> At about 8 p.m. on April 5, 1983, Mrs. Smith was brutally beaten about the head and face with a glass vase, the fragments of which were found in her apartment. . . . The vase itself was shattered by the blows, and the victim's skull was fractured in several places. Hemorrhaging of the brain resulted which compressed the brain stem and prevented breathing. Mrs. Smith died within a short time after the beating, although she was still alive when first found after it occurred.
> Appellant had taken a number of sleeping tablets and other drugs during the day on April 5 to relieve a headache, according to his testimony. He had, however, conducted normal activities during that day, having visited Mrs. Welch's apartment at least twice and kept her infant son for a few hours. At about 6:20 p.m. he borrowed her automobile and left the apartment for the purpose of borrowing some money. He returned about 7 p.m. and spoke with two acquaintances in a parking lot of the apartment complex. The three agreed to meet later at the apartment of one of these men to watch

television. Appellant told his friend that he needed to borrow some money to purchase beer and that he might try to borrow the money from Mrs. Smith.

Shortly before 8 p.m. Greg Peters, who lived with his wife and infant child in the apartment next to Mrs. Smith, heard loud thumping noises in her apartment. He went outside on the balcony and then heard the sound of glass breaking and moans emanating from her apartment. He testified that as he reached for the door, appellant rushed out of the apartment exclaiming that Mrs. Smith had fallen and was hurt. Peters went inside and found Mrs. Smith, still partially conscious, lying in the kitchen in a pool of blood, with broken glass from a shattered flower vase scattered on the floor. Peters ran outside and called for help.

Mr. Frank Garland, who lived in the apartment directly beneath Mrs. Smith, also heard noises from her apartment. He then heard Peters calling for help, and he saw appellant McNish coming down the steps from the upstairs apartments. He saw nothing unusual in the appearance of appellant at that time. He testified that appellant stopped and spoke to the son of a Mrs. Irene Nave, who lived in the apartment next to Garland. He also spoke to Mrs. Nave briefly at the doorway and then went to the parking lot and drove away in Mrs. Welch's automobile. Other witnesses testified that appellant drove away rapidly. Hearing Peters call again for assistance, Garland went upstairs where he found Mrs. Smith unconscious in her kitchen. He attempted to call for help and had his wife summon the police. . . .

Appellant drove Mrs. Welch's automobile some mile and one-half to two miles to the residence of his former wife, Mrs. Janie Bradley. He had a mishap en route, near a cemetery, and damaged the car slightly. He also claimed that he received some minor injuries in this accident. When he reached the residence of Mrs. Bradley, she testified that his speech was slurred and that he appeared to some extent to be under the influence of a drug or narcotic. He told her that he had taken a number of pills, that he had wrecked Mrs. Welch's car, and that he had been in a fight with someone, whom he would not identify. He said that he had been hit with a "tool." His nose was cut and bruised and there was a cut inside his mouth. There was some blood on his trousers and on his hands.

Appellant requested a bottle of beer, which Mrs. Bradley did not have. She gave him some Tylenol for relief of his headache. He washed his hands and face and lay down briefly. He told Mrs. Bradley that he needed to "get out of there" and asked her to take him to a Mental Health Center in Johnson City, where he had previously received treatment. At her request he drove Mrs. Welch's automobile to a nearby school, parking it in the rear of the kitchen. Mrs. Bradley then drove him in her automobile to his parents' apartment where she obtained for him some fresh trousers. Appellant lay in the back seat of her automobile during this time. She then drove to a nearby market to purchase some bread for his mother, while he changed trousers in the back seat of the car.

-4-

As they approached the market, an Elizabethton detective observed the automobile which was similar to that of Mrs. Welch. He had been advised of the beating of Mrs. Smith and of appellant's leaving. He apprehended appellant as he sat in the back seat of Mrs. Bradley's automobile at the market. He also retrieved appellant's bloodstained trousers from the automobile.

At no time during this interval did appellant state to Mrs. Bradley, to his parents, to Mrs. Welch or to the police officer that Mrs. Smith had been injured or killed, that he had observed her, or that he had any information whatever concerning her. This was emphasized later by the State, after appellant professed to remember the events of the evening and accused Mrs. Welch and Mr. Peters of conspiring to murder Mrs. Smith.

Appellant was taken to police headquarters by a county deputy sheriff who said that appellant volunteered to him the statement, "I guess I'm in trouble for what I did."

Appellant denied making this statement. The deputy testified that he had not questioned appellant either before or after the statement was made and that he did not pursue the matter further, other than to tell appellant that he did not wish to talk with someone who had beaten an elderly lady. This evoked no response from appellant, according to the deputy.

When appellant was subsequently questioned at police headquarters he denied any knowledge of the incident involving Mrs. Smith. He stated that he was partially under the influence of narcotics, but at no time did he admit any involvement in the beating of Mrs. Smith which subsequently resulted in her death. Police officers who took appellant's statement testified that it was given voluntarily and after appellant was fully advised of his rights. They testified that appellant appeared to be somewhat under the influence of some intoxicant, although they detected no odor of alcohol, and all of them testified that he appeared in full command of his faculties. Tests of his blood later revealed small traces of sedatives, but a toxicologist called on behalf of appellant at trial testified that these were not mind-altering and, in the quantities found present in his blood, would not have caused him to appear abnormal or irrational to persons observing him.

Scientific tests of the blood found on appellant's trousers showed that it matched that of the victim, Mrs. Smith, and that it was not the blood of appellant. Some blood particles taken from his fingernails were found to be human blood, but it was in quantities too small to test. An analysis performed at the Tennessee Bureau of Investigation laboratories showed that a fragment of glass found inside the packaging material in which appellant's trousers had been transmitted matched the glass particles found on the rug and floor of Mrs. Smith's apartment.

Throughout the weeks and months immediately following the death of Mrs. Smith, appellant remained silent and adhered to the position that he knew nothing whatever about the subject. Some seven months after her death, however, in November 1983, he wrote a letter to the District Attorney stating that he had known all

along that two other persons were responsible for her death and had conspired to kill her. He gave a statement to the District Attorney, which was similar to his later testimony at the trial, to the effect that Mrs. Welch, who was nineteen years old, was jealous of him and suspected him of being sexually intimate with the 70-year-old Mrs. Smith. He also stated to the police and later testified at trial that Peters disliked Mrs. Smith and that he had heard Mrs. Welch and Mr. Peters threatening to murder her.

Appellant stated that on April 5, 1983 he had gone to Mrs. Smith's apartment to borrow some money from her when he happened upon Greg Peters "standing there, shaking her by the hair of the head, telling her to shut up." He struggled with Peters until the latter struck him on the bridge of his nose and knocked him unconscious. When he recovered, appellant found Mrs. Smith lying in the kitchen and attempted to move her to a couch in the living room but was unable to do so. He stated that he heard Peters making noise outside but by the time appellant reached the door, someone else had come up the stairs. Appellant advised this other person that Mrs. Smith was injured and needed assistance. He followed this other person into Mrs. Nave's apartment where he asked Mrs. Nave to call the rescue squad. Appellant claimed that he was "all to pieces" and so severely emotionally shaken by the events that he needed to talk to someone and decided to go to a mental health center. Unable to drive safely, however, he went to the home of his former wife for assistance. He ascribed his behavior during the evening to confusion, fear and the effects of drugs.

There was much conflicting testimony at the trial as to whether Peters was or was not involved in the homicide, and major issues of credibility of appellant as well as other witnesses were presented to the trier of fact. Appellant was severely cross-examined and impeached with respect to the inconsistency between his conduct and statements on the evening of April 5, 1983, and the statement which he gave to the police seven months later, the latter being essentially similar to his trial testimony.

The jury obviously did not accept appellant's version of the events surrounding the homicide of Mrs. Smith and found appellant guilty of murder in the first degree. The record abundantly supports that verdict. Mrs. Smith was mercilessly beaten to death by repeated blows by an assailant who was obviously much more powerful than she. Appellant was shown both by the testimony of Peters and by his own statements and testimony to have been in her apartment, from which he fled quickly and without any satisfactory explanation. He consistently denied knowing anything about her homicide or being involved until months later, at which time he presented a rather bizarre and insubstantial story seeking to implicate Peters and appellant's former girl friend, Mrs. Welch, from whom he had by that time become estranged.

. . .

At the sentencing hearing the State introduced several photographs of the deceased in support of the aggravating

circumstance which the jury found to have been established. The State relied upon another aggravating circumstance, that the murder was committed while appellant was attempting to commit robbery, T.C.A. Sec. 39-2-203(i)(7), but the jury did not find that circumstance to have been established by the evidence.

Appellant relied upon testimony from his parents, relatives, and friends as well as himself seeking clemency from the jury. He particularly relied upon mitigating circumstances of the absence of any prior criminal record, T.C.A. Sec. 39-2-203(j)(1), and extreme mental or emotional disturbance (T.C.A. Sec. 39-2-203(j)(2)).

The jury found that no mitigating circumstance was established sufficient to outweigh the aggravating circumstance established by the evidence and sentenced appellant to death. The trial judge approved the verdict and overruled post-trial motions filed on behalf of appellant.

Id. at 491-94.

Because Defendant filed his original petition for post-conviction relief in March of 1990, prior to the Post-Conviction Procedure Act of 1995 which heightened a petitioner's burden of proof, he bears the burden to prove his factual allegations by a preponderance of the evidence. McBee v. State, 655 S.W.2d 191, 195 (Tenn. Crim. App. 1993); see Tenn. Code Ann. § 40-30-210(f) (requiring a petitioner to prove factual allegations by clear and convincing evidence). In addition, findings of fact made by the post-conviction court are conclusive on appeal so long as the evidence does not preponderate against these findings. Butler v. State, 789 S.W.2d 898, 899 (Tenn. 1990).

I. FULL AND FAIR HEARING ON POST-CONVICTION PETITION

Defendant first argues that the post-conviction court violated his right to due process of law by denying him a full and fair hearing on his allegations of constitutional deprivations occurring at trial. Specifically, he contends that the court denied him a full and fair hearing (1) by "rushing" his post-conviction counsel to a hearing shortly after they were appointed and before they were

adequately prepared, (2) by improperly denying his requests for investigatory and expert services, and (3) by improperly restricting the evidence he was permitted to present at the post-conviction hearing.

Contrary to Defendant's assertion, while we must determine whether his rights to due process were satisfied in the trial court on post-conviction, we need not necessarily find that he was afforded a "full and fair hearing," such that he was granted "every opportunity to present evidence and argument." See House v. State, 911 S.W.2d 705, 711 (Tenn. 1995), cert. denied, House v. Tennessee, 517 U.S. 1193, 1193 (1996). A review by this Court of whether a defendant received a full and fair hearing at an earlier date is triggered only when that defendant seeks and is denied the opportunity to present an issue on the basis that the issue has been previously determined by a court of competent jurisdiction. See Tenn. Code Ann. § 40-30-112 (stating that a post-conviction ground for relief is previously determined, and thereby excluded from further review, "if a court of competent jurisdiction has ruled on the merits after a full and fair hearing") (repealed and replaced by Tennessee Code Annotated § 40-30-206(h)). Following a thorough review of the post-conviction record, we conclude that the post-conviction court did not violate Defendant's right to due process.

*A. Adequate Preparation Time*

The procedural history of this post-conviction cause reflects that Defendant filed his original petition for post-conviction relief in March of 1990; and the court appointed representation, including Attorney Eddie Lauderback, on that date. Lauderback represented Defendant with the assistance of a succession of co-counsel until the court replaced him with the newly created Post-Conviction

Defender's Office on April 30, 1996. The post-conviction court appointed the last of Lauderback's co-counsel, Attorney Mark Slagle, on January 5, 1996. Slagle continued his representation of Defendant after the appointment of the Post-Conviction Defender's Office, and they coordinated their efforts on behalf of Defendant up to and including the present appeal.

The post-conviction court originally set Defendant's hearing for May 30, 1996, but continued the case until June 26 because the newly created defender's office could not begin its responsibilities on the case until April 30. One week prior to June 26, defense counsel again moved for a continuance, and the trial court reset Defendant's hearing for October 1. No other requests to continue appear in the record. Due to an illness, a defense expert witness could not testify at the October 1 hearing; and the post-conviction court therefore permitted the defense to carry over its proof to the second installment of the hearing, held on January 14, 1997.

Defendant charges that "four months" is "woefully inadequate" to prepare for a post-conviction hearing in a capital case. In addition, he insists that significant evidence remained undeveloped at the time of the hearing. Specifically, he argues, counsel were not able to (1) obtain and analyze all of [former] trial counsel's files; (2) conduct continuing social history interviews of Defendant; (3) interview others from Defendant's social history; (4) gather social history documents and records; and (5) consult with experts regarding results of these efforts.

The State responds that the post-conviction court was "generous" by providing trial counsel adequate time for preparation. According to the State, Defendant had not four months to prepare, but six years, due to the successive chain of counsel as well as the long-time investigation by Defendant's attorney for five years of that time, Eddie Lauderback. The State also notes that the defense did not request the trial court to continue the case for a specific period of time.

We agree with the State that although Defendant characterizes the procedural history on post-conviction as chaotic, the defense remained coordinated enough to adequately prepare for the evidentiary hearing in an appropriate amount of time. Through his continuous, five-year representation, Attorney Lauderback served as the common thread for what might otherwise have been a disjointed effort at defense. Lauderback conveyed the case to Attorney Slagle, who saw the case to the hearing nine months later (and who continues to serve as Defendant's counsel) with the assistance of advocates who specialize in post-conviction capital cases. Finally, Defendant gained additional time when the trial court continued the proof for three and one-half months to permit in-court testimony by the defense expert witnesses.

Based on the facts in the record, we find that the post-conviction court did not violate due process by denying Defendant additional time in which to prepare for the post-conviction evidentiary hearing. See, e.g., State v. Cazes, 875 S.W.2d 253, 261 (Tenn. 1994) (holding that the trial court did not abuse its discretion by denying a capital defendant a continuance where trial counsel were appointed to the case two and one-half months prior to trial, prior counsel worked

on case for thirteen months before trial counsel were appointed, and many continuances had been granted at the defendant's request).

### B. Requests for Investigatory and Expert Services

The second tenet of Defendant's due process claim concerns the post-conviction court's denial of his motion for investigative and expert services. Defendant cites Tennessee Code Annotated §§ 40-30-215 and 40-14-207(b), stating, "These statutes require the post-conviction court to grant the services requested if, based on the motion and the evidence presented at the ex parte hearing, the petitioner makes a threshold showing of particularized need." He asserts that post-conviction counsel made this threshold showing.

In particular, Defendant contends that the post-conviction court erred by granting his motion for the expert services necessary to prove that he suffered deficient representation at trial (the first prong of Strickland analysis on ineffective assistance of counsel),[1] while reserving his decision for funding of experts necessary to prove prejudice to his defense (the second Strickland prong). The post-conviction court explained that if Defendant could not bear his burden of proof on the issue of deficient representation, then the court need not waste state expenses for expert services to prove the issue of prejudice—absent success on the former element, proof of the latter element would not merit relief from the court.

---

[1] See Strickland v. Washington, 466 U.S. 668 (1984).

The State responds that the post-conviction court properly denied Defendant's motion for expert services to show prejudice from deficient representation at trial. The State notes that the post-conviction court clearly indicated to Defendant that if deficient representation was shown, funding for additional services would be forthcoming. Finally, the State argues that Defendant was not entitled by law to the services the post-conviction court granted him—namely "attorney-expert" Ann Short, who testified that in her professional opinion, the performance by Defendant's trial counsel fell below the standard of competent criminal defense attorneys in several respects—because Defendant's post-conviction counsel should have, and customarily would have, performed this task themselves without the assistance of an attorney acting as an "expert on attorneys."

### 1. Motion for Ex Parte Hearing

Tennessee Code Annotated § 40-14-207 provides,

> In capital cases where the defendant has been found to be indigent by the court of record having jurisdiction of the case, such court in an ex parte hearing may, in its discretion, determine that investigative or expert services or other similar services are necessary to ensure that the constitutional rights of the defendant are properly protected. If such determination is made, the court may grant prior authorization for these necessary services in a reasonable amount to be determined by the court.

Tenn. Code Ann. § 40-14-207(b). The Tennessee Supreme Court has held § 40-14-207(b) applicable to post-conviction proceedings for capital defendants. Owens v. State, 908 S.W.2d 923, 928 (Tenn. 1995).

In Owens, the supreme court held that the same procedures used pretrial to obtain an ex parte hearing on a motion for expert or investigative services

apply prior to a defendant's post-conviction evidentiary hearing. Id. These procedures, found in Tennessee Supreme Court Rule 13, require a defendant to include in the motion for services: (1) the name of the proposed expert or service; (2) how, when, and where the examination is to be conducted or the services are to be performed; (3) the cost of the evaluation and report thereof; and (4) the cost of any other necessary services, such as court appearances. Tenn. Sup. Ct. R. 13, § 2(B)(10).

Defendant's initial motion to the post-conviction court and its supporting affidavits appear to have been omitted from the record on appeal. However, because the post-conviction court granted a telephone conference on this matter prior to granting the services of Ann Short and denying all other services, we assume for the purpose of this appeal that Defendant fulfilled the Rule 13 prerequisites for an ex parte hearing.

2. Particularized Need for Services

The Owens court declared that a motion for services should be granted if, at the ex parte hearing, the petitioner "demonstrates that investigative or expert services are necessary to ensure the protection of the petitioner's constitutional rights." 908 S.W.2d at 928. To demonstrate necessity, a defendant should meet the same test as required by courts reviewing direct appeals in capital cases: "The defendant must show that a substantial need exists requiring the assistance of state paid supporting services and that his defense cannot be fully developed without such professional assistance." State v. Evans, 838 S.W.2d 185, 192 (Tenn. 1992); Owens, 908 S.W.2d at 928 (adopting rule in Evans for post-conviction petitioners in capital cases). Furthermore, a trial court may properly

deny a motion for services that is "accompanied by little more than undeveloped assertions that the services were needed to attempt to counter the State's proof." State v. Cazes, 875 S.W.2d 253, 261 (Tenn. 1994); see State v. Barnett, 909 S.W.2d 423, 431 (Tenn. 1995) (stating that "[u]nsupported assertions that a psychiatric expert is necessary to counter the State's proof are not sufficient" to meet the threshold showing of particularized need for a non-capital defendant).

The "determination of whether provision of expert services to an indigent capital defendant is necessary to ensure that the constitutional rights of the defendant are properly protected is entrusted to the discretion of the trial court." Cazes, 875 S.W.2d at 261 (citing Tenn. Code Ann. § 40-14-207(b) (stating that the court "in an ex parte hearing may, in its discretion, determine that investigative or expert services or other similar services are necessary to ensure that the constitutional rights of the defendant are properly protected")); see Owens, 908 S.W.2d at 929 (observing that § 40-14-207(b) "vests with the trial court discretion to determine if investigative or expert services are necessary to ensure that the movant's constitutional rights are protected"); Thompson v. State, 958 S.W.2d 156, 169 (Tenn. Crim. App. 1997). Therefore, this Court must affirm the decision of the trial court unless the facts show an abuse of discretion.

In this case, the record does not contain a transcription of the teleconference apparently conducted as a hearing on Defendant's ex parte motion for services. In Thompson, 958 S.W.2d at 171, this Court announced that we may not review a decision by the trial court for abuse of discretion where we are not privy to the presentation of proof made by a defendant in support of the

motion for services. Id. Thompson states, "Owens clearly contemplates a presentation of proof . . . . Without a record of the hearing, this court cannot determine whether [the judge] erred by denying the motion." Id. Likewise, we cannot examine whether the trial judge abused his discretion in this case without a record of the proof brought before that court.

Shortly before his evidentiary hearing in the trial court, Defendant moved the court to reconsider its decision to deny his requests for all services except those of Attorney Ann Short. In that written motion, Defendant relied upon his earlier motion and its supporting affidavits, which, as noted, do not appear to have been included in the record. Upon the ex parte hearing of this motion to reconsider, held prior to proof on the first day of Defendant's evidentiary hearing, counsel presented no proof but instead requested the opportunity to have Ann Short appear ex parte at a future date to attest to the need for additional services.

The post-conviction judge indicated that he did not intend to hear substantive proof from Ms. Short in an ex parte proceeding, but that he would treat Defendant's motion for investigative and expert services as a continuing one. The judge instructed Defendant that if he proved deficient representation in the course of the post-conviction hearing, then additional, necessary services would be granted. The judge stated, "Ex parte only means you—you've got a right to ask the court to give you certain funds for services . . . not to have the court hear ex parte any substantive evidence."

Based upon the foregoing recitation of authority, we find that the post-conviction judge misstated his authority and duty to hold an ex parte hearing in

-15-

which Defendant had an opportunity (and indeed a duty, in order to prevail) to present concrete facts tending to show a particularized need for the investigative or expert services. However, the post-conviction judge's misstatement of the law does not entitle Defendant to relief. At the motion to reconsider the denial of additional services, Defendant was clearly unprepared to present evidence to show a particularized need for the services. In the absence of a transcript memorializing the evidence presented at his first ex parte teleconference, Defendant cannot bear his burden of proof that the post-conviction judge abused his discretion by denying additional investigative and expert services.

### C. Restriction of Post-Conviction Evidence

Defendant next argues that the trial court impaired his right to present evidence to support his case at the post-conviction hearing by limiting the proof advanced during witness Walter William Foster's testimony. Furthermore, he asserts the post-conviction judge created a hostile atmosphere at the evidentiary hearing by referring to witnesses Archie Parlier and Louise McNeil as irrelevant.

In response, the State contends the record demonstrates that the trial court permitted each of these witnesses to fully testify. The State posits that the trial judge simply performed his function as gatekeeper of admissible evidence and that although the judge determined some testimony inadmissible based upon relevancy, he nevertheless permitted questioning as an offer of proof for the record.

### 1. Archie Parlier

When Defendant called Archie Parlier to testify at the post-conviction evidentiary hearing, the State immediately objected on the grounds that his testimony was irrelevant ("outside the scope of th[e] hearing"). The post-conviction judge sustained the State's objection, saying, "I won't consider it as any substantive proof in the case. I think it's an improper impeachment of . . . the jury verdict," and permitted Defendant to examine the witness by leading questions for an offer of proof. We find that the trial court's comments were within the proper scope of issuing a ruling on the objection to admissibility of the evidence and therefore not for the purpose or to the effect of creating a hostile atmosphere. Moreover, the trial judge permitted a thorough examination of Parlier as a proffer into evidence notwithstanding the fact that he had already ruled the testimony outside the scope of post-conviction proof. Only after defense counsel had rested and thereafter reconsidered and resumed questioning did the trial court cease Defendant's proffer. We find no improper limitation on proof.

2. Louise McNeil

The post-conviction record reflects that after permitting testimony by Louise McNeil which, when transcribed, spanned several pages, the court sua sponte inquired into the relevancy of the witness. Defendant's counsel explained that he was attempting to elicit information known by McNeil which was critical to Defendant's case at trial.[2] The trial judge replied, "The . . . issue of guilt and innocence has already been decided. The Supreme Court affirmed it. And this . . . evidence is really irrelevant until you show why it wasn't presented. There

_____

[2] McNeil offered the opinion that Greg Peters was a violent person and that she did not want to be alone with him.

-17-

might have been a good reason why [McNeil] wasn't called." In addition, the trial judge expressed, "You've got to prove whether defense counsel knew about this witness, whether there was some reason he didn't call this witness and all that."

Defendant's post-conviction counsel explained, "[The order of witnesses] was just a question of trying to work out the convenience of the attorney's schedules with the witness schedules." Although the trial court seems to have become increasingly impatient with the order of the witnesses, we can find no impermissible restriction of the proof. The trial court permitted McNeil to continue her testimony; furthermore, it appears that the court was primarily concerned with judicial economy: "[I]t seems to me that . . . you ought to start off at the top with . . . that and not subject everybody to listening to what may be irrelevant proof.[3]

### 3. Walter William Foster

Similarly, the trial court objected to the time at which former Sheriff's Deputy Foster's testimony was given. Defense counsel called Foster to testify that he had previously been convicted of felonies in Louisiana, information which was not provided to the defense either before or during trial and which the defense argues would have been greatly relevant to impeaching Foster's credibility at trial.[4] The trial court deemed this testimony irrelevant and ordered the witness excused until such time as Defendant "proved to [the trial court] that [Foster's] testimony is material."

---

[3] The State provided this footnote, which the Court finds relevant to reproduce: "In fact, it would come out during the questioning of trial counsel Ken Baldwin that McNeil was not called at trial because she had no first-hand knowledge of any violent behavior by Greg Peters."

[4] At trial, Foster testified that Defendant had told him on the evening of the murder, "I guess I'm in trouble for what I did." In addition, Foster testified that he had failed to report this statement to anyone until shortly before trial (over one year after the occurrence).

The trial court later permitted Foster to testify concerning his convictions and subsequent pardon by the governor of Louisiana. Foster stated that the Sheriff of Carter County (the county of this action) knew about his convictions prior to the trial of this case and that, in fact, Judge Don Lewis, Sheriff George Papantonio, and numerous other law enforcement officers had written letters on Foster's behalf to the governor of Louisiana recommending that Foster be pardoned for his crimes. Finally, Foster admitted that he had not revealed his convictions on his written application to become a Carter County Deputy Sheriff. Defendant has presented no evidence before this Court that the trial court restricted his post-conviction hearing. In addition, we find no evidence that the trial court created a hostile atmosphere by ruling Foster's testimony irrelevant until proven relevant through other witnesses.[5]

## II. BRADY VIOLATION

In his second issue, Defendant contends the trial court erred by concluding that no Brady violation occurred where the State did not disclose evidence that former deputy sheriff Walter William Foster had been convicted of felonies in Louisiana and that Foster had failed to disclose those convictions as required on his application for employment with the sheriff's department, among other documents. See Brady v. Maryland, 373 U.S. 83 (1963).

In order to prove a due process violation under Brady v. Maryland, Defendant must show that (1) the State suppressed the information, (2) the information was favorable to the accused, and (3) the information was material.

---

[5] Because we have concluded that the trial court did not create a hostile atmosphere with respect to Defendant's proof, we decline to address whether a hostile atmosphere, in and of itself, can function as a denial of due process in a hearing before the trial court without a jury.

State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995). The undisclosed information is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985). Furthermore, a reasonable probability is a "probability sufficient to undermine confidence in the outcome." Id. In Giglio v. United States, 405 U.S. 150, 154-155 (1972), the Supreme Court held that impeachment evidence falls under the Brady rule. See also, United States v. Bagley, 473 U.S. 667, 676 (1985); Davis v. State, 823 S.W.2d 217, 218 (Tenn. Crim. App., 1991).

In Kyles v. Whitley, 514 U.S. 419 (1995), the United States Supreme Court clarified the materiality standard set forth in Bagley. Id. at 433-37. First, "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." Id. at 434. Therefore, according to the Court, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id.

Next, the Kyles Court directed that a defendant "need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." Id. at 434-35. The majority disputed the conclusion of the dissent in that case, commenting,

> This rule is clear, and none of the Brady cases has ever suggested that sufficiency of the evidence . . . is the touchstone. And yet the dissent appears to assume that Kyles must lose because there would still have been adequate evidence to convict even if the favorable evidence had been disclosed.

-20-

Id. at 435 n.8; see Strickler v. Greene, 119 S. Ct. 1936 (1999).

Third, the Court cautioned that constitutional errors under Brady are not subject to a harmless error rule—a notion quite related to the last point of emphasis, in that a court is not at liberty to conclude that the totality of the evidence indicating guilt renders the nondisclosure harmless beyond a reasonable doubt. Id. at 435. Finally, the Kyles Court stressed that all suppressed or undisclosed evidence should be considered cumulatively to determine its materiality. Id. at 436.

Turning to the facts of this case, in support of his assignment of error, Defendant argues that contrary to the trial court's ruling, the evidence not disclosed was indeed material. Defendant correctly notes that the State conceded the first prongs of Brady: that the evidence was favorable to the defense and that knowledge of the information by state law enforcement officials is imputed to the State as prosecution. Therefore, the only issue for review is whether the evidence was material. If the undisclosed testimony was material to the defense, then Defendant is entitled to a reversal.

In its order denying post-conviction relief, the trial court stated,

> In order to qualify as material, there must be a reasonable probability that the evidence, had it been disclosed, would have changed the result of the trial. After a thorough review of the evidence presented at the petitioner's trial, this court concludes that this evidence is not material. There was overwhelming evidence of the petitioner's guilt presented at trial. Furthermore, even if the court were to assume the admissibility of the evidence of the felony burglaries and Officer's Foster's nondisclosure of them on an employment application, the court finds that they have little impeachment value in light of the full pardon Officer Foster had received.

In response, Defendant challenges this finding, arguing in his brief that the trial court's reliance upon Foster's official pardon was erroneous because the pardon did not serve to negate the conviction for impeachment purposes, nor did the pardon eliminate Foster's duty to disclose the convictions on his employment application—also evidence Defendant would have used for impeachment. Defendant contends, "Had the trial court allowed a full examination of Deputy Foster at the post-conviction hearing, [Defendant] would have established that the Louisiana pardon would have done nothing to diminish the value of this evidence as impeachment."

We disagree with Defendant's impression of the trial court's decision. First, we find no improper reliance on Foster's pardon by the trial court. Although Defendant correctly argues that the pardon could not have relieved Foster of the legal duty to report his convictions (therefore, the pardon has no effect upon Foster's falsification of his employment application), the trial court appears to have placed greater importance on the practical value of the pardon in the perception of the jury, as it would have been used to rehabilitate Foster at trial.

Second, the trial court's estimation of the practical impact of Foster's convictions, falsification, and pardon were influenced by the significant weight of evidence against Defendant. Though, as the Supreme Court has instructed, the sufficiency of the evidence has no bearing on a test of materiality, the strength of the additional convicting evidence is pivotal in our determination of whether the suppressed Brady evidence places the case in "such a different light so as to undermine confidence in the verdict." See Kyles v. Whitley, 514 U.S. 419, 435 (1995). The post-conviction court in the case at bar found the evidence of guilt

so overwhelming that consideration of the undisclosed evidence could not undermine its confidence in the outcome of the trial. We agree, and for this reason we affirm the trial court's denial of post-conviction relief on this issue.

### III. EXCLUSION OF ARCHIE PARLIER'S TESTIMONY

As previously addressed, Defendant called Archie Parlier, a juror at his trial, to testify at his post-conviction hearing. The trial court sustained the State's immediate objection that Parlier's testimony was "outside the scope" of the post-conviction hearing—an impermissible attempt to impeach the jury's verdict. Defendant requested the opportunity to proffer evidence to preserve his record for appeal, and the trial court granted his request, permitting limited questioning.

Parlier testified that the foreperson for the jury which decided Defendant's case discussed with the jury that if sentenced to life imprisonment, Defendant would "probably" only serve six to eight years before being released. Parlier stated that had he been assured that a sentence of life would ensure that Defendant remained imprisoned for his lifetime, his verdict would "[m]ore than likely" have changed. Furthermore, he ventured the opinion that the other jurors relied upon this piece of information as a pivotal issue on sentencing. Finally, Parlier testified that the foreperson did not indicate where she had learned the information she passed on to the jury.

Tennessee Rule of Evidence 606 provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotion as influencing that juror to assent to or dissent from the verdict or indictment or concerning the juror's

mental processes, except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion; nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Tenn. R. Evid. 606(b).

Defendant argues that Juror Parlier's testimony, if explored, would have successfully impeached the jury's verdict by proving extraneous prejudicial information, necessitating a new sentencing hearing. The State argues that Parlier's testimony reflected only his mental processes and that the trial court correctly excluded the testimony as inadmissible. We agree that the testimony was inadmissible to impeach the jury's verdict, and we affirm the trial court's decision to exclude this testimony.

First, contrary to Defendant's assertions, the trial court did not unreasonably curtail his offer of proof with Parlier. The record reflects that defense counsel ceased his questioning by stating, "That's all." Defendant's counsel thereupon stated, "Just one minute, Your Honor," and recommenced his questioning. After counsel posed his second additional question to the witness, the trial court cut short questioning, commenting, "You've gone far enough with this. That's enough." Defendant had essentially ended his proffer through this witness when he realized his desire to further explore the issue. The trial court permitted Defendant's questioning until he became confident that the post-conviction proceedings were being frustrated by Defendant's attempts to introduce proof which could not secure him relief.

Second, the trial court correctly excluded Parlier's testimony from the post-conviction proof. We believe the facts of this case are most similar to those in State v. Workman, 667 S.W.2d 44, 51-52 (Tenn. 1984). In Workman, the defendant "presented evidence that the jury had discussed parole time for a life sentence, the possibility that defendant would never be executed, and the consequences if the jury could not agree on a verdict." Id. at 52. The Tennessee Supreme Court recounted that the trial court in that case "found that the defendant was trying to impeach the verdict and disallowed an offer of proof that one juror was affected by the irrelevant talk." Id. The supreme court concurred with the decision of the trial court, affirming Workman's conviction and sentence of death. Id.

Likewise, in State v. Keen, 926 S.W.2d 727 (Tenn. 1994), the defendant, in support of his motion for new trial, offered the affidavit of a juror "to the effect that the amount of time a person would serve on a life sentence was considered by him and other jurors in reaching their verdict." Id. at 738. In concluding that such discussions do not constitute "extraneous prejudicial information" prohibited by Tennessee Rule of Evidence 606, the supreme court stated, "We are constrained to say that question would not be an unusual one for a jury to consider and debate in reaching a verdict in a capital case." Id.

Our supreme court elaborated on its interpretation of "extraneous prejudicial information" in State v. Coker, 746 S.W.2d 167 (Tenn. 1987). The court stated,

> Extraneous means "coming from without" and the fact that one or more jurors may have commented about the possibility of defendant employing a third person to murder one or more jurors would not be

-25-

admissible unless the comment included information that the threat originated from and was transmitted to the jury by an outside source.

Id. at 171. In this case, Juror Parlier testified that the jury foreperson did not indicate her source of knowledge. We must assume that she spoke from a generalized belief that criminal defendants sentenced to life incarceration serve only six to eight years; and while this information was incorrect, Defendant is not entitled to relief absent an outside source of knowledge.

In Caldararo v. Vanderbilt University, 794 S.W.2d 738 (Tenn. Ct. App. 1990), the Tennessee Court of Appeals thoroughly examined the issue of extraneous prejudicial information. Id. at 740-44. The court noted,

> External influences that could warrant a new trial if found to be prejudicial include: (1) exposure to news items about the trial, (2) consideration of facts not admitted in evidence, and (3) communications with non-jurors about the case. Internal influences that are not grounds to overturn a verdict include: (1) discussions among jurors, (2) intimidation or harassment of one juror by another, (3) a juror's personal experiences not directly related to the litigation, and (4) a juror's subjective thoughts, fears, and emotions.

Id. at 742 (citations omitted). We conclude that the information communicated by the foreperson of the jury in the case at bar constituted an internal influence; therefore, the trial court properly excluded Parlier's testimony from the substantive evidence taken at the post-conviction hearing.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

In support of his argument that his trial counsel were ineffective, Defendant contends that they (1) failed to identify and request forensic experts, (2) failed to adequately investigate in the guilt phase of trial, (3) failed to "know relevant law," (4) failed to adequately move to suppress Defendant's statement to police, (5) failed to adequately investigate in the sentencing phase, (6) failed to identify and

request sentencing mitigation experts, and (7) that the post-conviction court utilized an incorrect standard to determine ineffectiveness of counsel.

To determine whether counsel provided effective assistance at trial, the court must decide whether counsel's performance was within the range of competence demanded of attorneys in criminal cases. Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To succeed on a claim that his counsel was ineffective at trial, a petitioner bears the burden of showing that his counsel made errors so serious that he was not functioning as counsel as guaranteed under the Sixth Amendment and that the deficient representation prejudiced the petitioner, resulting in a failure to produce a reliable result. Strickland v. Washington, 466 U.S. 668, 687 (1984); Cooper v. State, 849 S.W.2d 744, 747 (Tenn. 1993); Butler v. State, 789 S.W.2d 898, 899 (Tenn. 1990). To satisfy the second prong, the petitioner must show a reasonable probability that; but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding petitioner's guilt. Strickland, 466 U.S. at 695. This reasonable probability must be "sufficient to undermine confidence in the outcome." Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994).

When reviewing trial counsel's actions, this Court should not use the benefit of hindsight to second-guess trial strategy and criticize counsel's tactics. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Counsel's alleged errors should be judged at the time they were made in light of all facts and circumstances. Strickland, 466 U.S. at 690; see Cooper 849 S.W.2d at 746.

If afforded a post-conviction evidentiary hearing by the trial court, a petitioner must do more than merely present evidence tending to show incompetent representation and prejudice; he must prove his factual allegations by the preponderance of the evidence.[6] State v. Clenny, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978). When an evidentiary hearing is held, findings of fact made by that court are conclusive and binding on this Court unless the evidence preponderates against them. Cooper v. State, 849 S.W.2d 744, 746 (Tenn.1993) (citing Butler v. State, 789 S.W.2d 898, 899 (Tenn.1990)).

Following the post-conviction hearing, the post-conviction court concluded that Defendant had not suffered the ineffective assistance of trial counsel. We agree with the conclusion that Defendant received the effective assistance of counsel at trial and on direct appeal of his conviction, and we address the arguments collectively.

*A. Location of Victim's Wounds and Bloodstained Clothing*

Defendant first states that his counsel were ineffective for failing to identify and request forensic experts—specifically, a pathologist and criminologist. Defendant contends that "the evidence these experts would have presented would establish [Defendant's] innocence by confirming that the attacker was right-handed and that the blood splatter pattern on [Defendant's] clothes is consistent with his version of the events and inconsistent with Greg Peters' version of the events." Furthermore, he argues that trial counsel were deficient for generally failing to investigate (1) the "left-handed/right-handed" theory that

_____

[6] Defendant filed his petition for post-conviction relief on March 23, 1990, prior to the amendment requiring petitioners to prove factual allegation by clear and convincing evidence. See Tenn. Code Ann. § 40-30-210(f).

only a right-handed person, Greg Peters, could have inflicted the victim's wounds, and (2) the manner in which blood left patterns on Defendant's and Peters' clothing, to determine whose version of events was more likely.

The trial court found, following a "thorough review of the trial record and the testimony from the evidentiary hearing," that Defendant "failed to show how he was prejudiced by any of the alleged errors." Because the post-conviction court denied Defendant the assistance of requested experts that he claimed were necessary to show prejudice, however, Defendant argues that the court's ruling was improper. Based upon the post-conviction judge's continued assurance that he would provide funding for additional expert services if Defendant proved initially that his trial counsel had been ineffective, we must assume for the purpose of review that the post-conviction court's denial of those additional services indicated that he found no evidence of deficient representation under the Strickland standard.

At the post-conviction evidentiary hearing, Defendant's trial counsel testified that he had neither recollection of nor explanation for the failure to explore a theory that the blows to the victim could not have been administered by a left-handed person (Defendant), but must have been delivered only by a right-handed person (Greg Peters). Defendant contends that this evidence could have exculpated him at trial, had his counsel secured an expert to show that the victim's assailant could not have been left-handed.

Had Defendant's trial counsel been able to show that a left-handed person could never have inflicted the victim's injuries, of course, the outcome of the trial

could have been different. However, without more than an assertion that an expert could have shown that a left-handed person could not have delivered the blows, we are constrained to hold that Defendant has not shown (and we believe cannot show) either that counsel fell below the standard of care for a criminal defense attorney or that there exists a reasonable probability of a different result.

Defendant's trial counsel also testified that they did not investigate the blood splatters on Defendant's clothing in an attempt to detract attention from their existence. We believe this was a legitimate trial strategy outside the scope of proper review by this Court. The evidence at trial showed that Defendant's pants had blood "splattered" on them, while Peters' shirt was "smeared" with blood. It is within common knowledge that a splatter bloodstain would occur from blood spurting at some force, while a blood smear would arise from contact with a bloody surface. In this way, the splatter pattern on Defendant's pants versus Peters' smeared shirt supports the State's theory of the case—that Defendant inflicted the wounds and Peters attempted to assist the victim in the aftermath of the attack. Therefore, trial counsel's decision to forego investigation of the resulting bloodstains did not constitute deficient performance.

### B. Failure to Investigate

First, Defendant contends that counsel were ineffective for failing to vigorously cross-examine Greg Peters, because Peters was the key witness in the case. The post-conviction court concluded in general that Defendant failed to show he was prejudiced by any potential errors of counsel. We agree with Defendant that the credibility of Peters was crucial to Defendant's case.

However, his contention that counsel's performance fell below the standard of care to his prejudice for failing to bring out through cross-examination that Peters was right-handed lacks merit. We find nothing in the record tending to show that there is a reasonable probability that had counsel shown Peters is right-handed, the jury would have had reasonable doubt about Defendant's guilt.

Next, Defendant argues that counsel were ineffective for failing "to investigate and present evidence that no robbery had occurred, in spite of the fact that the State's theory involved a robbery-murder." According to Defendant, his trial counsel "should have presented evidence that [Defendant] had no money when he was arrested," "should have pursued questions establishing that Greg Peters had not been searched to determine if he had money," and "should have interviewed and presented Ms. [Louise] McNeil as a witness regarding the fact that she found the victim's purse at the crime scene." In addition, he claims that defense counsel should have investigated and further developed testimony given at the post-conviction evidentiary hearing by the victim's neighbor, Frank Garland, that twenty seconds lapsed between the time he heard a commotion in the victim's apartment and the time he heard Greg Peters call for help.

Again, conscientious decisions regarding investigation, development, and direct and cross-examination are best considered judgments of trial strategy within the discretion of counsel and not subject to the scrutiny of hindsight. Furthermore, we cannot conclude there is a reasonable probability that had the jury known the victim's purse was found in her bedroom closet and Defendant possessed no money when he was arrested, it would have had reasonable doubt whether Defendant killed the victim. Nor can we say that the testimony presented

-31-

by Garland would have had such an effect upon Greg Peters' credibility so as to create reasonable doubt. The evidence at trial strongly indicated Defendant's guilt, as noted by the post-conviction court in its Findings of Fact and Conclusions of Law. We find that Defendant has neither shown his counsel erred nor how he was prejudiced by any such error, and we conclude that nothing presented thus far has undermined our confidence in the verdict of the jury.

*C. Failure to Know Relevant Law*

Defendant next claims that his counsel were ineffective for failing to know relevant Tennessee criminal law. He contends that counsel should have procured the exclusion of former Deputy Foster's testimony inculpating Defendant or that counsel should have obtained a continuance. The supreme court on direct review determined that the statement to Foster was not discoverable. State v. McNish, 727 S.W.2d 490, 496 (Tenn. 1987). In addition, we have held that the information presented by Foster was not material under Brady v. Maryland, see supra Part II; therefore, we find no prejudice to Defendant. Furthermore, we find no prejudice in counsel's failure to secure a continuance upon learning of the new information; Defendant has not proposed to the Court how a continuance would have created a reasonable probability of a different result.

*D. Failure to Adequately Move to Suppress Defendant's Statement*

In his next issue, Defendant argues that trial counsel were ineffective by failing to adequately move to suppress the statement Defendant made to officers on the night of his arrest. He argues that counsel should have investigated and

presented evidence to show that he was too intoxicated or impaired by drugs to have given the statement knowingly and voluntarily.

The State responds by noting that the Tennessee Supreme Court affirmed the voluntary nature of Defendant's statement in McNish, 727 S.W.2d at 496. In that opinion, the court stated,

> The trial judge conducted a suppression hearing and found that the statement was voluntarily and freely given after appellant had been fully advised of his rights and had signed a written waiver. The evidence supports the findings of the trial judge and certainly does not establish the contention of the appellant that he was so intoxicated from drugs at that time as to be incapable of realizing the consequences of his statement.

Id. Furthermore, the State points out that Defendant's testimony at trial indicated he had a clear, coherent, and comprehensive memory of the events on the evening of the murder. The State argues that one may infer from the detailed nature of the testimony that Defendant waived his right to counsel and right to remain silent knowingly and voluntarily, without impairment by the narcotics in his system.

We find that Defendant has not shown by a preponderance of the evidence how he was prejudiced by counsel's failure to further investigate his degree of intoxication when he delivered the statement to officers. Assuming that such failure constituted deficient representation, and further assuming that trial counsel were able to procure suppression of the statement, Defendant has not shown the reasonable probability of a different result at trial. This issue lacks merit.

*E. Failure to Adequately Investigate and Present Mitigation*

-33-

Defendant contends that his trial counsel breached the standard of care of attorneys in capital criminal cases to his prejudice by failing to adequately investigate and present mitigation testimony in the sentencing phase of his trial. He argues that counsel should have requested psychological experts to investigate and testify regarding his extensive history of poor mental health and substance abuse. He maintains that because of the aforementioned "rush" to the post-conviction hearing in this case, post-conviction counsel did not have time to adequately locate and present this evidence. See supra Part I. We affirm the decision of the post-conviction judge, who stated,

> Petitioner's trial attorneys testified that they chose not to pursue a mental defense at sentencing because it did not mesh with the petitioner's defense that Greg Peters was the assailant and because much of the petitioner's psychological history revealed negative aspects of his character that the prosecutor could capitalize on if mental capacity was put at issue. His trial attorneys also stated that any history of blackouts that the petitioner may have experienced had absolutely nothing to do with this case. A review of the exhibits relating to the petitioner's mental history reveals that the petitioner suffered from long term drug abuse. There is also an escalating pattern of anger control problems noted in the psychological history. Besides the negative aspects of the escalating anger control problems, the reports all state a negative prognosis due to the petitioner's unwillingness to undergo a proper course of treatment. Furthermore, after a thorough review of the overwhelming evidence presented at trial, the court notes that the petitioner testified extensively regarding the events leading up to the victim's death. Thus, the trial court agrees with trial counsel that any history of blackouts that the petitioner may have experienced had very little, if anything, to do with the events relating to this offense. Quite simply, the court concludes that the petitioner has failed to meet his burden of proof with respect to these allegations by his failure to show how he was prejudiced by any of counsel's acts or omissions.

We agree entirely with the post-conviction court's exhaustive and comprehensive review of this issue. This issue lacks merit.


*E. Improper Standard for Effective Assistance*

-34-

Finally, Defendant asserts that the post-conviction judge used an improper standard to determine whether his trial counsel had been ineffective by relying on an outcome- or result-determinative test for prejudice. As the State notes, the trial court recited in its Findings of Fact and Conclusions of Law in this case,

> In order to be granted relief on the grounds of ineffective assistance of counsel, the petitioner must establish that the advice given or the services rendered were not within the range of competence demanded of attorneys in criminal cases and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

(Quoting Strickland v. Washington, 466 U.S. 668, 693 (1984)). Thus, we conclude that the trial court knew and applied the proper standard to determine whether Defendant suffered the ineffective assistance of counsel.

As our Supreme Court stated in Henly v. State, 960 S.W.2d 572, 580 (Tenn. 1997),

> Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim. Indeed, a court need not address the components in any particular order or even address both if the defendant makes an insufficient showing of one component. Strickland, 466 U.S. at 697, 104 S.Ct. at 2069; Goad, 938 S.W.2d at 370.

## V. HEINOUS, ATROCIOUS, AND CRUEL AGGRAVATOR

In his next assignment of error, Defendant argues that the post-conviction court erred by failing to find that the "heinous, atrocious, and cruel" aggravating circumstance (HAC) for sentencing was unconstitutionally vague. The State contends that this issue was previously determined by the Tennessee Supreme Court on direct appeal. See State v. McNish, 727 S.W.2d 490, 494 (Tenn. 1987).

In McNish, the supreme court concluded that the evidence was sufficient to show that the murder was especially heinous, atrocious, or cruel and demonstrated torture and depravity of mind. Id. (citing Tenn. Code Ann. § 39-2-203(i)(5) (repealed)). It is also apparent from that opinion that Defendant challenged "the constitutionality of the Tennessee statutory provisions respecting the death penalty in first degree murder cases" on eleven points of law. Id. However, because the supreme court declined to address these specifically, this Court cannot determine from that opinion whether Defendant specifically challenged this aggravator as unconstitutionally vague, as he does in this appeal. Therefore, we will not consider the issue previously determined, as the State urges.

Nevertheless, Defendant is not entitled to relief on this issue. The trial court instructed the jurors that to impose the death penalty, they must find beyond a reasonable doubt that "[t]he murder was especially heinous, atrocious or cruel in that it involved torture or depravity of mind." Tenn. Code Ann. § 39-2-203(i)(5) (repealed and replaced in 1989 by § 39-13-204(i)(5), which states, "The murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death . . . ."). Though

the statute no longer contains this form of the aggravator, the Tennessee Supreme Court has many times affirmed its constitutionality and affirmed death sentences based upon its application. E.g., King v. State, 989 S.W.2d 319, 326 (Tenn. 1999); State v. Hall, 976 S.W.2d 121, 162-63 (Tenn. 1998); State v. Cauthern, 967 S.W.2d 726, 732-33 (Tenn. 1998) (holding that had the jury been instructed properly—on the pre-1989 § 39-2-203(i)(5) aggravator—the evidence would have been sufficient to establish the factor); State v. Hines, 919 S.W.2d 573, 584 (Tenn. 1995); Hartman v. State, 896 S.W.2d 94, 106 (Tenn. 1995); State v. Black, 815 S.W.2d 166, 181-82 (Tenn. 1991); State v. Williams, 690 S.W.2d 517, 526-31 (Tenn. 1985) (determining that the instruction was constitutional, but that the evidence did not support its application); State v. Middlebrooks, ____ S.W.2d ____ (Tenn. 1999) (pre-1989 § 39-2-203(i)(5) aggravator again found to withstand constitutional attack).

In the second prong to Defendant's challenge to the HAC aggravator, he argues that the jury engaged in impermissible "double counting" when it found the applicability of the "heinous, atrocious, and cruel" aggravator, relying upon State v. Middlebrooks, 840 S.W.2d 317 (Tenn. 1992), for support. The crux of this argument is that the State impermissibly used the same evidence—blows to the victim's skull—to prove both (1) the actus reas of the offense of murder, and (2) the aggravating factor which permits the jury to sentence Defendant to death. He contends, "[I]t was the blows to the [victim's] head that 'hastened' the death and therefore the same blows, especially without some intent that they cause the victim not to die immediately, cannot also be used to prove HAC."

In a case featuring a similar argument to the case at bar, the Tennessee Supreme Court addressed a contention that the same evidence was improperly used to support two different statutory aggravators. State v. Hall, 958 S.W.2d 679, 692 (Tenn. 1997). The court initially noted, "Contrary to the defendant's assertion, Middlebrooks did not embrace the broad principle of double counting . . . which precludes the use of the same evidence to establish more than one aggravating circumstance." Id. The court nevertheless concluded that the same evidence had not been used to support both aggravators, recognizing that "[t]he jury's finding of the (i)(5) [HAC] circumstance was based upon the torturous means by which the defendant chose to kill the victim, and the suffering she endured prior to her death." Id.

We agree that applying the HAC aggravator requires a jury to consider whether the instance of murder has been aggravated by the manner and circumstances surrounding the death—a distinction assisted by the use of the adverb "especially" and the concept of "torture," which elevate the level of atrocity to a degree beyond the means or method of the murder. The foregoing issue lacks merit.

VI. ELECTROCUTION AS CRUEL AND UNUSUAL PUNISHMENT

In his next issue, Defendant contends that the death penalty, as carried out by electrocution, constitutes cruel and unusual punishment. The State argues that this issue has been waived, and the trial court so found, noting that Defendant "failed to present this allegation at any prior proceeding." This Court is constrained to agree.

Tennessee Code Annotated § 40-30-206 provides:

> A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless:
> (1) The claim for relief is based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution requires retroactive application of that right; or
> (2) The failure to present the ground was the result of state action in violation of the federal or state constitution.

Id. § 40-30-206(g). Defendant did not present this issue upon direct appeal, and we therefore consider it waived. Furthermore, the issue lacks merit, as also noted by the trial court within its Findings of Fact and Conclusions of Law issued following Defendant's post-conviction hearing. See, e.g., State v. Pike, 978 S.W.2d 904, 925 (Tenn. 1998); State v. Cazes, 875 S.W.2d 253, 268 (Tenn. 1994); State v. Howell, 868 S.W.2d 238, 258 (Tenn. 1993); State v. Black, 815 S.W.2d 166, 179 (Tenn. 1991).


## VII. JURY INSTRUCTION ON MITIGATING FACTORS

In his seventh issue, Defendant argues that the trial court improperly instructed the jury at sentencing, resulting in a denial of his right to individualized sentencing. He alleges that the mitigation instruction given at his sentencing hearing "failed to adequately inform the jury of its ability to consider non-statutory mitigation," citing Hitchcock v. Dugger, 481 U.S. 393 (1987). Defendant asserts that the trial court failed to address this issue in its Findings of Fact and Conclusions of Law. The State responds (1) that the jury was indeed instructed that it must consider any mitigation evidence presented, not limited to those enumerated; and (2) that contrary to Defendant's reading, Hitchcock holds a trial court cannot instruct a jury not to consider evidence of non-statutory mitigating factors.

In <u>Hitchcock</u>, Justice Scalia, speaking for the Court, found that "it could not be clearer that the advisory jury was instructed not to consider, and the sentencing judge refused to consider, evidence of nonstatutory mitigating circumstances"; and it remanded the case, holding that the proceedings at the original sentencing did not comport with <u>Skipper v. South Carolina</u>, 476 U.S. 1 (1986), <u>Eddings v. Oklahoma</u>, 455 U.S. 104 (1982), and <u>Lockett v. Ohio</u>, 438 U.S. 586 (1978). <u>Id.</u> at 398-99. Later, in his dissenting opinion to <u>McKoy v. North Carolina</u>, 494 U.S. 433 (1990), Justice Scalia acknowledged, "The principle established by [<u>Skipper</u>, <u>Eddings</u>, and <u>Lockett</u>, <u>inter alia</u>] is that a State may not preclude the sentencer from considering and giving effect to evidence of any relevant mitigating circumstance proffered by the defendant." <u>Id.</u> at 1245 (Scalia, J., dissenting).

Upon a review of the decisions of the United States Supreme Court, we conclude that the trial court did not err by its instruction to the jury regarding statutory and non-statutory mitigating circumstances. The instruction given in this case provided, "In arriving at the punishment the jury shall consider, as heretofore indicated, any mitigating circumstance which shall include, but not be limited to the following: [enumeration of statutory factors]." We follow the law in this state: that such an instruction, which replicates the statutory terms provided in Tennessee Code Annotated § 39-13-204(j), not only does not in any manner preclude the jury from considering non-statutory mitigation, but in fact affirmatively directs the jury that it <u>should</u> consider <u>any</u> mitigating circumstance, statutory and non-statutory. <u>See</u> <u>State v. Smith</u>, 857 S.W.2d 1, 22 (Tenn. 1997).

## VIII. WAIVER OF ADDITIONAL ISSUES

Finally, Defendant argues that the post-conviction court erred by considering several post-conviction issues waived. Specifically, he asserts that the court improperly considered his arguments regarding the constitutionality of the death penalty waived because the contentions supported a proper post-conviction argument on the ineffective assistance of his trial court for failing to constitutionally challenge the death penalty on direct appeal.

Defendant provides a lengthy discourse on the law of waiver, and by footnote indicates that he desires to preserve this issue for later review. Despite this wish, we need not determine whether Defendant argued below that his trial counsel were ineffective for failing to challenge the constitutionality of the death penalty (which would certainly be a permissible argument, not subject to waiver, in post-conviction proceedings). Rather, we need only recognize what the trial court held—that none of his challenges to the constitutionality of the death penalty bears merit. See, e.g., State v. Cazes, 875 S.W.2d 253, 268-69 (Tenn. 1994); State v. Smith, 857 S.W.2d 1, 22 (Tenn. 1993). Therefore, Defendant has not and cannot satisfy the prejudice prong of the Strickland test for ineffective assistance of counsel. See Strickland v. Washington, 466 U.S. 668, 687 (1984).[7]

---

[7] To facilitate later review, those issues Defendant argues here (which he claims support a contention of ineffective assistance of counsel) are: that Tennessee's death penalty statute (1) allows the jury to afford too little weight to non-statutory mitigating factors; (2) does not require the jury to determine that death is the appropriate punishment; (3) does not require written findings of fact relative to the presence of aggravating and mitigating factors, thereby precluding effective appellate review; (4) allows the State to argue last in the sentencing phase; (5) prohibits the jury from being informed of the consequences of a non-unanimous verdict in the sentencing phase; (6) does not allow the correction of misconceptions about the length of a life sentence, parole eligibility, consecutive versus concurrent sentences, the cost of incarceration versus the cost of execution, the deterrent effect of the death penalty, and the idea that electrocution causes instantaneous and painless death.

Because we have concluded that none of Defendant's issues for review bear merit, we affirm the decision of the trial court denying post-conviction relief.

_____
DAVID H. WELLES, JUDGE

CONCUR:

_____
JAMES CURWOOD WITT, JR., JUDGE

_____
L. T. LAFFERTY, SENIOR JUDGE