STATE of Tennessee, Appellee,

v.

David McNISH, Appellant.

Supreme Court of Tennessee,
at Knoxville.

March 23, 1987.

Richard A. Spivey, Daniel P. Street, Kingsport, for appellant.

W.J. Michael Cody, Atty. Gen. & Reporter, Gordon W. Smith, Asst. Atty. Gen., for appellee.

## OPINION

HARBISON, Justice.

Appellant was convicted of murder in the first degree and sentenced to death by electrocution. The jury found that the murder by bludgeoning of Mrs. Gladys Smith, a 70–year-old widow, in her apartment on April 5, 1983, was "especially heinous, atrocious, or cruel in that it involved torture or depravity of mind...." T.C.A. § 39–2–203(i)(5). The case was appealed to this Court pursuant to § 39–2–205. After review of the briefs of counsel and of the record, we are of the opinion that the verdict and the sentence should be affirmed.

Mrs. Smith lived alone in an upstairs apartment in the Lynnwood Apartments in Elizabethton, Tennessee. The parents of appellant had an apartment in the same complex of apartment buildings, as did Mrs. Selena Richardson (who was at that time Mrs. Selena Welch), whom appellant had been dating. Appellant was 31 years of age at the time of the trial of this case in 1984. He had previously been divorced and at least since the summer of 1982 had been unemployed. He spent a great deal of time in and near the apartment complex, visiting his parents and Mrs. Welch. He testified that he was also a friend of the deceased and had been very attentive to her needs, frequently running errands for her and otherwise assisting her. The testimony was that the victim, Mrs. Smith, was frail, weighing less than one hundred pounds, but that she was still capable of independently living in her own apartment.

Appellant weighed about 165 pounds and held a black belt in karate. Since 1974 he had used prescription drugs rather heavily because he suffered from headaches that grew out of injuries in an automobile accident during that year. He also testified that he purchased street drugs from time to time. Having little income, he sometimes borrowed a few dollars from friends, including Mrs. Smith.

At about 8 p.m. on April 5, 1983, Mrs. Smith was brutally beaten about the head and face with a glass vase, the fragments of which were found in her apartment. It was one of a pair of such vases which belonged to her. The vase itself was shattered by the blows, and the victim's skull was fractured in several places. Hemorrhaging of the brain resulted which compressed the brain stem and prevented breathing. Mrs. Smith died within a short time after the beating, although she was still alive when first found after it occurred.

Appellant had taken a number of sleeping tablets and other drugs during the day on April 5 to relieve a headache, according to his testimony. He had, however, conducted normal activities during that day, having visited Mrs. Welch's apartment at least twice and kept her infant son for a few hours. At about 6:20 p.m. he borrowed her automobile and left the apartment for the purpose of borrowing some money. He returned about 7 p.m. and spoke with two acquaintances in a parking lot of the apartment complex. The three agreed to meet later at the apartment of one of these men to watch television. Appellant told his friend that he needed to borrow some money to purchase beer and that he might try to borrow the money from Mrs. Smith.

Shortly before 8 p.m. Greg Peters, who lived with his wife and infant child in the apartment next to Mrs. Smith, heard loud thumping noises in her apartment. He

went outside on the balcony and then heard the sound of glass breaking and moans emanating from her apartment. He testified that as he reached for the door, appellant rushed out of the apartment exclaiming that Mrs. Smith had fallen and was hurt. Peters went inside and found Mrs. Smith, still partially conscious, lying in the kitchen in a pool of blood, with broken glass from a shattered flower vase scattered on the floor. Peters ran outside and called for help.

Mr. Frank Garland, who lived in the apartment directly beneath Mrs. Smith, also heard noises from her apartment. He then heard Peters calling for help, and he saw appellant McNish coming down the steps from the upstairs apartments. He saw nothing unusual in the appearance of appellant at that time. He testified that appellant stopped and spoke to the son of a Mrs. Irene Nave, who lived in the apartment next to Garland. He also spoke to Mrs. Nave briefly at the doorway and then went to the parking lot and drove away in Mrs. Welch's automobile. Other witnesses testified that appellant drove away rapidly. Hearing Peters call again for assistance, Garland went upstairs where he found Mrs. Smith unconscious in her kitchen. He attempted to call for help and had his wife summon the police. Mrs. Nave had also placed a call for an emergency rescue squad, which appeared within a few minutes.

Appellant drove Mrs. Welch's automobile some mile and one-half to two miles to the residence of his former wife, Mrs. Janie Bradley. He had a mishap en route, near a cemetery, and damaged the car slightly. He also claimed that he received some minor injuries in this accident. When he reached the residence of Mrs. Bradley, she testified that his speech was slurred and that he appeared to some extent to be under the influence of a drug or narcotic. He told her that he had taken a number of pills, that he had wrecked Mrs. Welch's car, and that he had been in a fight with someone, whom he would not identify. He said that he had been hit with a "tool." His nose was cut and bruised and there was a cut inside his mouth. There was some blood on his trousers and on his hands.

Appellant requested a bottle of beer, which Mrs. Bradley did not have. She gave him some Tylenol for relief of his headache. He washed his hands and face and lay down briefly. He told Mrs. Bradley that he needed to "get out of there" and asked her to take him to a Mental Health Center in Johnson City, where he had previously received treatment. At her request he drove Mrs. Welch's automobile to a nearby school, parking it in the rear of the kitchen. Mrs. Bradley then drove him in her automobile to his parents' apartment where she obtained for him some fresh trousers. Appellant lay in the back seat of her automobile during this time. She then drove to a nearby market to purchase some bread for his mother, while he changed trousers in the back seat of the car.

As they approached the market, an Elizabethton detective observed the automobile which was similar to that of Mrs. Welch. He had been advised of the beating of Mrs. Smith and of appellant's leaving. He apprehended appellant as he sat in the back seat of Mrs. Bradley's automobile at the market. He also retrieved appellant's bloodstained trousers from the automobile.

At no time during this interval did appellant state to Mrs. Bradley, to his parents, to Mrs. Welch or to the police officer that Mrs. Smith had been injured or killed, that he had observed her, or that he had any information whatever concerning her. This was emphasized later by the State, after appellant professed to remember the events of the evening and accused Mrs. Welch and Mr. Peters of conspiring to murder Mrs. Smith.

Appellant was taken to police headquarters by a county deputy sheriff who said that appellant volunteered to him the statement, "I guess I'm in trouble for what I did."

Appellant denied making this statement. The deputy testified that he had not questioned appellant either before or after the statement was made and that he did not pursue the matter further, other than to tell appellant that he did not wish to talk

with someone who had beaten an elderly lady. This evoked no response from appellant, according to the deputy.

When appellant was subsequently questioned at police headquarters he denied any knowledge of the incident involving Mrs. Smith. He stated that he was partially under the influence of narcotics, but at no time did he admit any involvement in the beating of Mrs. Smith which subsequently resulted in her death. Police officers who took appellant's statement testified that it was given voluntarily and after appellant was fully advised of his rights. They testified that appellant appeared to be somewhat under the influence of some intoxicant, although they detected no odor of alcohol, and all of them testified that he appeared in full command of his faculties. Tests of his blood later revealed small traces of sedatives, but a toxicologist called on behalf of appellant at trial testified that these were not mind-altering and, in the quantities found present in his blood, would not have caused him to appear abnormal or irrational to persons observing him.

Scientific tests of the blood found on appellant's trousers showed that it matched that of the victim, Mrs. Smith, and that it was not the blood of appellant. Some blood particles taken from his fingernails were found to be human blood, but it was in quantities too small to test. An analysis performed at the Tennessee Bureau of Investigation laboratories showed that a fragment of glass found inside the packaging material in which appellant's trousers had been transmitted matched the glass particles found on the rug and floor of Mrs. Smith's apartment.

Throughout the weeks and months immediately following the death of Mrs. Smith, appellant remained silent and adhered to the position that he knew nothing whatever about the subject. Some seven months after her death, however, in November 1983, he wrote a letter to the District Attorney stating that he had known all along that two other persons were responsible for her death and had conspired to kill her. He gave a statement to the District Attorney, which was similar to his later testimony at the trial, to the effect that Mrs. Welch, who was nineteen years old, was jealous of him and suspected him of being sexually intimate with the 70–year-old Mrs. Smith. He also stated to the police and later testified at trial that Peters disliked Mrs. Smith and that he had heard Mrs. Welch and Mr. Peters threatening to murder her.

Appellant stated that on April 5, 1983 he had gone to Mrs. Smith's apartment to borrow some money from her when he happened upon Greg Peters "standing there, shaking her by the hair of the head, telling her to shut up." He struggled with Peters until the latter struck him on the bridge of his nose and knocked him unconscious. When he recovered, appellant found Mrs. Smith lying in the kitchen and attempted to move her to a couch in the living room but was unable to do so. He stated that he heard Peters making noise outside but by the time appellant reached the door, someone else had come up the stairs. Appellant advised this other person that Mrs. Smith was injured and needed assistance. He followed this other person into Mrs. Nave's apartment where he asked Mrs. Nave to call the rescue squad. Appellant claimed that he was "all to pieces" and so severely emotionally shaken by the events that he needed to talk to someone and decided to go to a mental health center. Unable to drive safely, however, he went to the home of his former wife for assistance. He ascribed his behavior during the evening to confusion, fear and the effects of drugs.

There was much conflicting testimony at the trial as to whether Peters was or was not involved in the homicide, and major issues of credibility of appellant as well as other witnesses were presented to the trier of fact. Appellant was severely cross-examined and impeached with respect to the inconsistency between his conduct and statements on the evening of April 5, 1983, and the statement which he gave to the police seven months later, the latter being essentially similar to his trial testimony.

■ The jury obviously did not accept appellant's version of the events surrounding the homicide of Mrs. Smith and found

appellant guilty of murder in the first degree. The record abundantly supports that verdict. Mrs. Smith was mercilessly beaten to death by repeated blows by an assailant who was obviously much more powerful than she. Appellant was shown both by the testimony of Peters and by his own statements and testimony to have been in her apartment, from which he fled quickly and without any satisfactory explanation. He consistently denied knowing anything about her homicide or being involved until months later, at which time he presented a rather bizarre and insubstantial story seeking to implicate Peters and appellant's former girl friend, Mrs. Welch, from whom he had by that time become estranged.

There was ample evidence of every element to establish murder in the first degree, including premeditation as demonstrated by the numerous severe and crushing blows inflicted upon the victim.

At the sentencing hearing the State introduced several photographs of the deceased in support of the aggravating circumstance which the jury found to have been established. The State relied upon another aggravating circumstance, that the murder was committed while appellant was attempting to commit robbery, T.C.A. § 39–2–203(i)(7), but the jury did not find that circumstance to have been established by the evidence.

Appellant relied upon testimony from his parents, relatives, and friends as well as himself seeking clemency from the jury. He particularly relied upon mitigating circumstances of the absence of any prior criminal record, T.C.A. § 39–2–203(j)(1), and extreme mental or emotional disturbance (T.C.A. § 39–2–203(j)(2)).

The jury found that no mitigating circumstance was established sufficient to outweigh the aggravating circumstance established by the evidence and sentenced appellant to death. The trial judge approved the verdict and overruled post-trial motions filed on behalf of appellant.

In their brief in this Court, counsel for appellant have raised eighteen issues, the first of them having eleven subsections. Only one of these challenges the sufficiency of the evidence to support the verdict or the sentence. After reviewing the record we find no merit in this assignment nor any basis for the assertion that the jury verdict was the result of bias, prejudice and passion against the appellant and sympathy for the victim.

In their first issue counsel for appellant challenge the constitutionality of the Tennessee statutory provisions respecting the death penalty in first degree murder cases. Each of the eleven subissues raised has been considered in depth by this Court in previous opinions, most of them on more than one occasion, and we find them to be without merit. We do not deem it necessary here to repeat citations to the many previous opinions of this Court dealing with these questions. By statute, however, we are required to determine whether or not the sentence of death in this case is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and of the accused. The death penalty has been upheld in similar cases. *See State v. Melson*, 638 S.W.2d 342 (Tenn.1982), *cert. denied*, 459 U.S. 1137, 103 S.Ct. 770, 74 L.Ed.2d 983 (1983); *State v. Barnes*, 703 S.W.2d 611 (Tenn.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 2260, 90 L.Ed.2d 705 (1986); although based upon a different aggravating circumstance, *see State v. Harbison*, 704 S.W.2d 314 (Tenn.1986), *cert. denied*, —— U.S. ——, 106 S.Ct. 2261, 90 L.Ed.2d 705 (1986), where a victim was bludgeoned to death by a heavy vase while her home was being burglarized.

■ The evidence in the present case shows that the victim was beaten several times and that she remained alive and at least partially conscious throughout her ordeal. We find no merit in the insistence of appellant that the evidence was insufficient to show that the murder was especially heinous, atrocious, or cruel and in the contention that it did not show torture or depravity of mind. *See State v. Williams*, 690 S.W.2d 517, 529 (Tenn.1985).

■ Counsel for appellant insists that the trial court erred in permitting the intro-

duction of four photographs at the sentencing hearing to show the nature and extent of the injuries inflicted upon the victim. As was true in the *Harbison* case, *supra,* the photographs are gruesome and graphic. They were not offered in evidence during the guilt phase of the trial, however, and they were clearly relevant to the aggravating circumstance found by the jury. While undoubtedly prejudicial to the accused, at this stage of the proceedings and in view of the aggravating circumstance alleged, they were highly probative of the nature and extent of the injuries inflicted upon the helpless victim. We agree with counsel for appellant that not every death by beating is necessarily or as a matter of law to be included within the category of "especially heinous, atrocious, or cruel ...," but the infliction of heavy, repeated and vicious blows to a helpless but conscious elderly victim may easily be found by a trier of fact to fall in that category. We find no error in connection with the admission of these photographs.

■ Appellant insists that the trial court erred at the sentencing hearing in permitting cross-examination of appellant's father about a prior criminal charge against appellant when a juvenile. While the question might have been improper under many circumstances, it was made relevant when appellant's father testified that appellant had never "been in any kind of trouble with the law" and had always conducted himself properly. The subject was clearly opened by the direct examination of appellant's father, and the brief questions asked by the State on cross-examination were proper impeachment and, in our opinion, could not in any event have affected the results of the sentencing hearing.

Appellant has challenged the jury instructions on the issue of premeditation. The instructions given were in accordance with a pattern jury instruction currently in use in this state, to the effect that premeditation does not require any particular period of time for information. Further, the infliction of repeated blows was sufficient evidence to justify an instruction upon this issue, as was proof that the victim was

unarmed, apparently offered no provocation and that the accused was cool and calm immediately after the homicide according to at least one witness. *See State v. Martin,* 702 S.W.2d 560, 562–63 (Tenn. 1985).

Counsel for appellant insists that it was error for the Court to submit at the sentencing hearing an issue as to whether the murder was committed during an attempt to rob or steal from the victim, T.C.A. § 39–2–203(i)(7). This circumstance was not found by the jury to have been established and was not the basis upon which the death penalty was based. There was, however, evidence that the appellant was short of funds, and his own testimony confirmed that of several other witnesses that he had planned to go to Mrs. Smith's apartment in an effort to obtain some money from her.

Appellant challenges the jury instructions at the guilt phase on the ground that there was error in the charge regarding a presumption of malice. Counsel relies upon *State v. Martin,* 702 S.W.2d 560 (Tenn.1985), but an examination of the jury instructions in the present case makes it clear that the trial judge was referring only to a permissible inference which the jurors were free to draw or not to draw from the evidence. There were explanatory instructions given in this case which were not present in *Martin, supra,* and throughout the instructions the trial judge made it clear that the State had the burden of establishing beyond a reasonable doubt every element of the offense charged. There was no instruction impermissibly shifting the burden of proof as found in *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).

■ It is urged that the trial court erred in admitting into evidence a letter written by the accused to the District Attorney while he was incarcerated and while he was represented by appointed counsel. The letter itself, however, states that it was written without knowledge or approval by the attorneys, that the accused was dissatisfied with his representation, and that he wanted to discuss the case with the District Attor-

ney in order to reveal the truth about the homicide. Before he gave any statement to officials who came to interview him in response to the letter, he was fully advised of his rights, and we find no violation thereof.

■ Counsel also challenged the initial statement given by appellant to investigating officers after he was taken into custody on the evening of April 5, 1983, immediately after the assault on Mrs. Smith. The trial judge conducted a suppression hearing and found that the statement was voluntarily and freely given after appellant had been fully advised of his rights and had signed a written waiver. The evidence supports the findings of the trial judge and certainly does not establish the contention of appellant that he was so intoxicated from drugs at that time as to be incapable of realizing the consequences of his statement.

The statement of appellant to the county deputy while he was being transported to police headquarters, referred to previously in reviewing the evidence in this case, is challenged on several grounds. It is insisted that appellant gave the statement without proper warning and that the State failed to disclose the statement to counsel for appellant upon request for discovery.

The evidence clearly showed that the statement was spontaneous and voluntary, and not elicited as a result of any interrogation or suggestion by the deputy, who had not otherwise been involved in the investigation of the case and knew none of the details. He was employed by Carter County, not by the City of Elizabethton, and merely transported appellant to the municipal police headquarters at the request of another officer.

■ Since the statement was not made in response to interrogation by the deputy, it was technically not discoverable under Rule 16(a)(1)(A), T.R.Crim.P., nor was it in fact even known by the prosecuting authorities until shortly before the trial when the deputy recalled the incident and reported it to the District Attorney. Counsel for appellant were advised of the statement promptly, and we find no error with respect to its admission.

Counsel for appellant insists that it was error for the trial judge not to permit argument as to "the realities" of death by electrocution. No evidence was offered on this subject, however, and the mere argument of counsel on the subject clearly would have been improper without such supporting evidence, even if such evidence had been otherwise relevant or admissible. We have no occasion to pass upon that question on this record.

Counsel have raised several issues regarding limitations on the examination of witnesses or the admission of evidence, but in each instance we find no error on the part of the trial court. In most instances the evidence complained of was admitted in response to issues raised by appellant on cross-examination; in other instances it was merely an elaboration upon other evidence already in the record. For example, error is assigned upon permitting the State to cross-examine appellant about his prior treatment at the mental health center. This subject had already been explored in some depth during the State's case in chief, as well as in the direct examination of the appellant himself.

An issue is raised that the trial judge erred in not granting appellant's request for psychiatric assistance. There is no citation to the record where any such request was made, nor have we discovered any written motion requesting the same.

We have carefully considered all of the issues raised by diligent counsel for appellant, and find no error which would warrant reversal of either the verdict of the jury or the sentence imposed. Both are affirmed, and the sentence will be carried out as provided by law on August 3, 1987, unless stayed by order of this Court or other proper authority. Costs are taxed to appellant.

FONES and DROWOTA, JJ., and FRANKS, Special Justice, concur.

BROCK, C.J., concurs in affirming the conviction in this case but dissents with respect to the imposition of the death

penalty for reasons stated in his dissenting opinion in *State v. Dicks*, 615 S.W.2d 126, 132 (Tenn.1981).