# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### April 3, 2013 Session

## STATE OF TENNESSEE v. CORINIO PRUITT

**Automatic Appeal from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. 06-00460      Chris B. Craft, Judge**

---

**No. W2009-01255-SC-DDT-DD - Filed October 8, 2013**

---

WILLIAM C. KOCH JR. and SHARON G. LEE, JJ., concurring in part and dissenting in part.

We concur fully with the Court's decision to affirm Corinio Pruitt's conviction for first-degree felony murder. However, we respectfully disagree with the manner in which the Court has carried out the proportionality analysis required by Tenn. Code Ann. § 39-13-206(c)(1)(D) (2010) because we believe that it is inconsistent with the plain requirements of the statute. After considering "both the nature of the crime and the defendant" in this case and in "similar cases" as required by Tenn. Code Ann. § 39-13-206(c)(1)(D), we conclude that Mr. Pruitt should be sentenced to life without the possibility of parole.

## I.

The text of the Constitution of Tennessee explicitly envisions the existence of the death penalty.[1] When imposed using proper substantive and procedural safeguards, the death penalty does not violate the Cruel and Unusual Punishments Clause in the Eighth Amendment to the United States Constitution or in Article I, Section 16 of the Tennessee Constitution.[2] It protects society from the most heinous violent offenders, and it inflicts appropriately severe retribution for the commission of the most serious crimes.

Consistent with the constraints imposed by the Constitution of the United States and the Constitution of Tennessee, the Tennessee General Assembly has decided that the death

---

[1] *See* Tenn. Const. art. I, § 8 ("That no man shall be . . . in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."); Tenn. Const. art. I, § 15 ("That all prisoners shall be bailable by sufficient sureties, unless for capital offences . . . .").

[2] *See State v. Black*, 815 S.W.2d 166, 188-91 (Tenn. 1991).

penalty is an appropriate punishment for a narrow, well-defined group of serious crimes. Accordingly, the members of the General Assembly, reflecting the will of their constituents, have enacted statutes that define the offenses that merit consideration of the death penalty and prescribe procedures to assure that the death penalty is imposed only upon those criminals who are the "worst of the bad."[3]

The death penalty is "an extreme sanction, suitable to the most extreme crimes."[4] Thus, reflecting Tennesseans' inherent sense of fairness, the General Assembly enacted safeguards intended to minimize the risk that the death penalty will be erroneously imposed and to assure that the death penalty is imposed fairly and proportionately. In 1977, the General Assembly enacted Tenn. Code Ann. § 39-13-206(c)(1)(D),[5] which requires the courts reviewing a death sentence to determine whether "[t]he sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant."[6]

This case is not about Mr. Pruitt's guilt or innocence. The State has proved beyond a reasonable doubt that Mr. Pruitt is guilty of first-degree felony murder. This case is also not about whether Mr. Pruitt should be punished for his crime. Human life is precious, and taking a human life while committing a felony is a serious crime that warrants rigorous punishment. Our concern in this case is how Tennessee's courts, independent of the decisions of the prosecutor and the jury, should carry out their responsibility under Tenn. Code Ann. § 39-13-206(c)(1)(D) to determine whether an accused's death sentence is "excessive or disproportionate to the penalty imposed in similar cases."

---

[3] *State v. Nichols*, 877 S.W.2d 722, 739 (Tenn. 1994); *State v. Howell*, 868 S.W.2d 238, 265 (Tenn. 1993) (Reid, C.J., concurring); *State v. Middlebrooks*, 840 S.W.2d 317, 350 (Tenn. 1992) (Drowota, J., concurring and dissenting).

[4] *Gregg v. Georgia*, 428 U.S. 153, 187 (1976).

[5] *See* Act of Mar. 30, 1977, ch. 51, § 4, 1977 Tenn. Pub. Acts 92, 102.

[6] The type of proportionality review required by Tenn. Code Ann. § 39-13-206(c)(1)(D) is individualized comparative proportionality review, as opposed to categorical "inherent" or "absolute" proportionality review. Considerations of categorical proportionality have led the United States Supreme Court to remove entire classes of crimes and criminals from death penalty eligibility. Examples include those who rape adults, *Coker v. Georgia*, 433 U.S. 584 (1977), the insane, *Ford v. Wainwright*, 477 U.S. 399 (1986), the intellectually disabled, *Atkins v. Virginia*, 536 U.S. 304 (2002), juveniles, *Roper v. Simmons*, 543 U.S. 551 (2005), and those who rape children, *Kennedy v. Louisiana*, 554 U.S. 407 (2008). *See* William W. Berry III, *Practicing Proportionality*, 64 Fla. L. Rev. 687, 688-89 (2012); Barry Latzer, *The Failure of Comparative Proportionality Review of Capital Cases (with Lessons from New Jersey)*, 64 Alb. L. Rev. 1161, 1167 (2001); Evan J. Mandery, *In Defense of Specific Proportionality Review*, 65 Alb. L. Rev. 883 (2002).

The Court has chosen to employ the analysis adopted in 1997 by a sharply divided (3-2) court. *State v. Bland*, 958 S.W.2d 651 (Tenn. 1997). In 2007, the American Bar Association's Death Penalty Assessment Project published the *Tennessee Death Penalty Assessment Report* ("ABA Report") concluding that *Bland*'s analysis "undercut[s]" the purpose of Tenn. Code Ann. § 39-13-206(c)(1)(D).[7] In light of the findings in the ABA Report and the Court's sixteen-year experience with *Bland*'s proportionality analysis, we have determined that using a pool of comparison cases selected with the same criteria used by the Court between 1977 and 1997 is more consistent with the plain language of Tenn. Code Ann. § 39-13-206(c)(1)(D) than the *Bland* analysis. The purpose of Tenn. Code Ann. § 39-13-206(c)(1)(D) will be better served by considering all cases that have resulted in convictions for first-degree murder.

## II.

All murders are serious crimes, but in modern times, most murders have not warranted the death penalty. Both this Court and the United States Supreme Court have held that it is constitutionally permissible to impose the death penalty for a murder only when the persons sentenced to death are "in some way worse, or materially more depraved, than those other first-degree murderers not executed." *State v. Middlebrooks*, 840 S.W.2d at 343. According to the United States Supreme Court, "capital punishment must be limited to those offenders who commit a narrow category of the most serious crimes and whose extreme culpability makes them most deserving of execution." *Kennedy v. Louisiana*, 554 U.S. at 420 (internal quotation marks omitted); *see also Kelly v. South Carolina*, 534 U.S. 246, 264 (2002) (Thomas, J., dissenting) (citing *Godfrey v. Georgia*, 446 U.S. 420, 433 (1980)). Thus, the United States Supreme Court has stated that "the culpability of the average murderer is insufficient to justify [the death penalty,] the most extreme sanction available to the State." *Atkins v. Virginia*, 536 U.S. at 319.

The death penalty "is different in kind from any other punishment imposed under our system of criminal justice." *Gregg v. Georgia*, 428 U.S. at 188. Accordingly, the General Assembly and the courts have adopted substantive and procedural safeguards to minimize the risk of error and to assure that the death penalty is constitutionally imposed.[8] One of

---

[7]American Bar Association, *Evaluating Fairness and Accuracy in State Death Penalty Systems: The Tennessee Death Penalty Assessment Report* 173 (Mar. 2007), *available at* http://www.americanbar.org/content/dam/aba/migrated/moratorium/assessmentproject/tennessee/finalreport.authcheckdam.pdf.

[8]The safeguards for defendants facing the death penalty include: (1) minimum qualifications for attorneys, Tenn. Sup. Ct. R. 13, § 3(c), (d); (2) bifurcated trials, Tenn. Code Ann. § 39-13-204(a) (Supp. 2012); (3) additional counsel at the State's expense if the defendant is indigent, Tenn. Sup. Ct. R. 13, § 3(b)(1); (4) additional expert witnesses at the State's expense if the defendant is indigent, Tenn. Sup. Ct. R. 13, 5(a)(1); and (5) automatic review of the sentence by this Court in accordance with Tenn. Code Ann. §

(continued...)

these procedural safeguards is the mandatory review codified at Tenn. Code Ann. § 39-13-206(c)(1). This statute states that:

> In reviewing the sentence of death for first degree murder, the reviewing courts shall determine whether:
>
> (A) The sentence of death was imposed in any arbitrary fashion;
>
> (B) The evidence supports the jury's finding of statutory aggravating circumstance or circumstances;
>
> (C) The evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and
>
> (D) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

The wording of Tenn. Code Ann. § 39-13-206(c)(1)(D) has remained unchanged since the General Assembly enacted the original proportionality review statute in 1977. This Court has often stated that the statute's purpose is to ensure "rationality and consistency in the imposition of the death penalty." *State v. Barber*, 753 S.W.2d 659, 665-66 (Tenn. 1988).

In 1981, this Court adopted Tenn. Sup. Ct. R. 12 to facilitate the proportionality review required by Tenn. Code Ann. § 39-13-206(c)(1)(D). This rule requires trial courts to submit a detailed report, commonly referred to as a "Rule 12" report, following every trial in which the accused is convicted of first- degree murder. Although our proportionality review has never been limited to these reports, the Rule 12 reports, as well as the database in which the contents of all the reports are organized, provide an important source of proportionality information to the bench and the bar.

Between 1977 and 1997, reviewing courts conducted proportionality reviews without "a structured review process." *State v. Hodges*, 944 S.W.2d 346, 363 (Tenn. 1997) (Reid, J., dissenting). It is clear, however, that the "similar cases" we utilized in our proportionality analysis included "all first degree murder cases in which life imprisonment or a sentence of death has been imposed." *State v. Barber*, 753 S.W.2d at 666; *see also State v. Hodges*, 944

---

[8](...continued)
39-13-206(c). Like other criminal defendants, those facing the death penalty may also seek collateral review of their conviction and sentence under the Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-101, -122 (2012), and through a petition for writ of habeas corpus and a writ of error coram nobis.

S.W.2d at 358. In other words, our pre-*Bland* proportionality review drew from all Rule 12-eligible cases, meaning all cases that resulted in a conviction for first-degree murder.[9]

### III.

The methodology reviewing courts use to conduct the proportionality review under Tenn. Code Ann. § 39-13-206(c)(1)(D) changed dramatically in 1997 when this Court decided *State v. Bland*. The majority opinion began appropriately enough by recognizing (1) that Tenn. Code Ann. § 39-13-206 must be considered "in light of the jurisprudential background of *Furman*[10] and *Gregg*," *State v. Bland*, 958 S.W.2d at 664; (2) that the purposes of proportionality review are to neutralize "aberrant" death sentences and "to guard against the capricious or random imposition of the death penalty," *State v. Bland*, 958 S.W.2d at 665; and (3) that proportionality review requires reviewing courts to "rely upon the experienced judgment and intuition of its own members," *State v. Bland*, 958 S.W.2d at 668.

Despite this solid conceptual foundation, the *Bland* majority then changed the proportionality analysis in a way that deviates not only from the language of Tenn. Code Ann. § 39-13-206(c)(1)(D) but also from the relevant decisions of the United States Supreme Court. Three prominent features of the *State v. Bland* analysis illustrate the difficulties with this change in approach.

First, the Court narrowed the pool of cases to be considered in a proportionality analysis. Rather than considering all cases that resulted in a conviction for first-degree murder (as the Court had done from 1977 to 1997), the Court limited the pool to "only those cases in which a capital sentencing hearing was actually conducted . . . regardless of the sentence actually imposed." *State v. Bland*, 958 S.W.2d at 666.[11] By narrowly construing "similar cases" in Tenn. Code Ann. § 39-13-206(c)(1)(D), the Court limited proportionality

---

[9]The automatic minimum sentence for first-degree murder is life imprisonment. Tenn. Code Ann. §§ 39-13-202(c), -204(a).

[10]*Furman v. Georgia*, 408 U.S. 238 (1972).

[11]The Court says we are mistaken in our conclusion that *State v. Bland* altered the proportionality analysis. Instead, the Court insists, *State v. Bland* merely articulated "the analysis the Court had consistently employed during the preceding eighteen years." We respectfully disagree because this claim in not supported by our prior decisions. In 1997, this Court conducted a proportionality analysis in three death penalty cases. In two cases decided in April 1997, the Court's proportionality analysis included "Rule 12 reports from trial judges submitted over the past eighteen years in *all criminal trials for first degree murder in which life imprisonment or a sentence of death has been imposed*." *State v. Hodges*, 944 S.W.2d 346, 358 (Tenn. 1997) (emphasis added); *State v. Bush*, 942 S.W.2d 489, 507 (Tenn. 1997). When the Court decided *State v. Bland* eight months later, it narrowed the pool of cases for the first time to those first degree murder cases in which a capital sentencing hearing was conducted.

review to only a small subset of Tennessee's murder cases – the small minority of cases in which a prosecutor actually sought the death penalty.

The second limiting feature of the *State v. Bland* proportionality analysis is found in the Court's change in the standard of review. The majority opinion held that a death sentence could be found disproportionate only when "the case, taken as a whole, is *plainly lacking* in circumstances consistent with those in similar cases in which the death penalty has been imposed." *State v. Bland*, 958 S.W.2d at 665 (emphasis added).[12] This change prevents the reviewing courts from determining whether the case under review exhibits the same level of shocking despicability that characterizes the bulk of our death penalty cases or, instead, whether it more closely resembles cases that resulted in lesser sentences.

The third limiting feature of the *State v. Bland* analysis is the seeming conflation of the consideration of the circumstances in Tenn. Code Ann. § 39-13-206(c)(1)(B) and Tenn. Code Ann. § 39-13-206(c)(1)(C) with the circumstance in Tenn. Code Ann. § 39-13-206(c)(1)(D). When reviewing a sentence of death for first-degree murder, the courts must separately address whether "[t]he evidence supports the jury's finding of statutory aggravating circumstance or circumstances;"[13] whether "[t]he evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances;"[14] and whether "[t]he sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant."[15]

As applied since 1997, *State v. Bland* has tipped the scales in favor of focusing on the evidentiary support for the aggravating circumstances found by the jury and on whether these circumstances outweigh the mitigating circumstances. Instead of independently addressing the evidence regarding "the nature of the crime and the defendant," *Bland*'s analysis has prompted reviewing courts to uphold a death sentence as along as the evidence substantiates the aggravating circumstance or circumstances found by the jury, as well as the jury's

---

[12]The *Bland* Court's use of the "plainly lacking in circumstances" standard also marks a departure from earlier death penalty decisions. A diligent search of this Court's death penalty decisions employing the proportionality analysis has failed to identify any case prior to *State v. Bland* in which the Court stated that a death sentence could be found disproportionate only when "the case, taken as a whole, is plainly lacking in circumstances consistent with those in similar cases in which the death penalty has been imposed." *State v. Bland*, 958 S.W.2d at 665.

[13]Tenn. Code Ann. § 39-13-206(c)(1)(B).

[14]Tenn. Code Ann. § 39-13-206(c)(1)(C).

[15]Tenn. Code Ann. § 39-13-206(c)(1)(D).

decision that the aggravating circumstance or circumstances outweigh any mitigating circumstances.

The significance of the change of approach in *State v. Bland* was not lost on two members of the Court. In his dissenting opinion, Justice Birch noted that narrowing the pool of cases to be considered will make it "quite difficult to conduct the proportionality review as required by Tenn. Code Ann. § 39-13-206(c)(1)." *State v. Bland*, 958 S.W.2d at 679 (Birch, J., concurring and dissenting). For his part, Justice Reid "share[d] the concerns expressed by Justice Birch . . . on this point," *State v. Bland*, 958 S.W.2d at 676 (Reid, J., concurring and dissenting), and observed that *State v. Bland*'s version of proportionality review could very well result in "the routine affirmation of jury verdicts accompanied by praise of the procedure." *State v. Bland*, 958 S.W.2d at 675 n.1.

## IV.

While the doctrine of *stare decisis* counsels that courts should be loathe to overturn established precedents, this case presents an area of law in which a course-correction is appropriate.[16] The general rule this Court follows is that

> well-settled rules of law will be overturned only when there is obvious error or unreasonableness in the precedent, changes in conditions which render the precedent obsolete, the likelihood that adherence to preceden[t] would cause greater harm to the community than would disregarding stare decisis, or an inconsistency between precedent and a constitutional provision.

*In re Estate of McFarland*, 167 S.W.3d 299, 306 (Tenn. 2005).

While honoring *stare decisis* is "usually the wise policy," *stare decisis* is "not a universal inexorable command." *City of Memphis v. Overton*, 216 Tenn. 293, 298, 392 S.W.2d 98, 100 (1965) (quoting *Burnet v. Coronado Oil & Gas Co.*, 285 U.S. 393, 405 (1932) (Brandeis, J., dissenting)). Thus, "if an error has been committed, and becomes plain and palpable, the court will not decline to correct it, even though it may have been reasserted and acquiesced in for a long number of years." *Arnold v. City of Knoxville*, 115 Tenn. 195, 202, 90 S.W. 469, 470 (1905); *see also Greenough v. Farm Bureau Mut. Ins. Co. of Idaho*,

---

[16]The United States Supreme Court has not permitted the doctrine of *stare decisis* to prevent overruling earlier decisions involving the application of the death penalty. In *Atkins v. Virginia*, the Court overruled the holding in *Penry v. Lynaugh*, 492 U.S. 302 (1989) that persons with intellectual disabilities could be executed. *Atkins v. Virginia*, 536 U.S. at 320-21. Similarly, in *Roper v. Simmons*, the Court overruled the holding in *Stanford v. Kentucky*, 492 U.S. 361 (1989) that older minors could be executed. *Roper v. Simmons*, 543 U.S. at 574-75.

130 P.3d 1127, 1131 (Idaho 2006) ("[W]hen the judicial interpretation of a statute is manifestly wrong, stare decisis does not require that we continue an incorrect reading of the statute."). Accordingly, we have held that "[o]ur oath is to do justice, not to perpetuate error." *Jordan v. Baptist Three Rivers Hosp.*, 984 S.W.2d 593, 599 (Tenn. 1999) (quoting *Montgomery v. Stephan*, 101 N.W.2d 227, 229 (Mich. 1960)).

This case provides the Court with an opportunity to consider whether the proportionality analysis in *State v. Bland* has proved to be as effective as the *Bland* majority anticipated or as problematic as *Bland*'s dissenting justices predicted. Since 1997, this Court has used the *State v. Bland* analysis to review fifty-four cases in which the death penalty has been imposed. We have upheld the imposition of the death penalty in all but one case. *See State v. Godsey*, 60 S.W.3d 759, 781-93 (Tenn. 2001). In another case, we reversed the conclusion of the Court of Criminal Appeals that the death penalty was disproportionate and reinstated the death penalty. *See State v. Copeland*, 226 S.W.3d 287, 305-07 (Tenn. 2007).

In 2007, ten years following the *State v. Bland* decision, a team of well-respected Tennessee attorneys, working under the auspices of the American Bar Association, released a report on the imposition of the death penalty in Tennessee. Among the areas of concern addressed in the report was the manner in which the reviewing courts were conducting the proportionality review under Tenn. Code Ann. § 39-13-206(c)(1)(D). The report recommended, among other things, that proportionality review should include "cases in which the death penalty was sought but not imposed, and cases in which the death penalty could have been sought." ABA Report, at 163, 173.[17] The ABA Report suggested that the *Bland* protocol's "plainly lacking" test effectively narrows the "pool" of comparison cases down to those in which the death penalty was actually imposed – a maneuver that "undercut[s]" the statute's purpose. ABA Report, at 173.[18]

The difference between this Court's pre-1997 proportionality review and post-1997 proportionality review is not inconsequential. As this case demonstrates, it is the difference between life and death. Based on this Court's sixteen-year experience with *State v. Bland*, as illuminated by the extensive special briefing in this case, it is difficult to reach any conclusion other than that *Bland*'s version of the proportionality analysis conflicts with the plain language of Tenn. Code Ann. § 39-13-206(c)(1)(D) and with the intent of the United States Supreme Court precedents that undergird this statute.

---

[17]The ABA Report relied, in part, on a prior in-state report released by the State Comptroller of the Treasury. ABA Report, at 113, 175 (citing John G. Morgan, et. al., *Tennessee's Death Penalty: Costs and Consequences* (2004), *available at* http://www.deathpenaltyinfo.org/documents/deathpenalty.pdf) ("Comptroller's Report").

[18]The same group of attorneys filed a brief in this case characterizing the "plainly lacking in circumstances" standard as a "departure" with "no basis in the statute" that "effectively eliminates from comparison" all cases that did not result in a sentence of death.

# V.

Proportionality review embodies the venerable adage that the punishment should fit the crime.[19] The appropriateness of imposing a particular punishment on a particular criminal is an evolving societal judgment.[20] The reviewing court's role in proportionality review is to attempt to gauge whether a death sentence is an appropriate punishment for the particular Tennessee prisoner.

A prosecutor's decision to seek the death penalty relies on the legal culture and policies of that judicial district. A jury's decision to impose the death penalty relies on the jury's assessment of the evidence introduced at trial. Tenn. Code Ann. § 39-13-206(c)(1)(D) requires reviewing courts to undertake an analysis that juries cannot perform. Equipped with a pool of comparison cases to which the jury has no access, a reviewing court must survey cases statewide to ensure that those who receive the death penalty are "similar" in terms of their culpability and the savageness of their crimes.

The *State v. Bland* analysis hampers proportionality review under Tenn. Code Ann. § 39-13-206(c)(1)(D) by placing unnecessary blinders on the reviewing court. Proportionality plainly requires a statewide consideration of similar cases. Thus, if a particular homicide is one that would clearly not result in the pursuit of the death penalty in most districts, then imposition of the death penalty in that case would not be proportionate to the crime. The *Bland* analysis hides the full picture from the reviewing courts.

*State v. Bland*'s "plainly lacking in circumstances" standard of review also unnecessarily ties a reviewing court's hands. Only the least heinous murders committed by persons who have faced the death penalty will qualify as disproportionate using this test. But the federal and state constitutions require that the death penalty be reserved for the "worst

---

[19] *See, e.g.*, Tennessee's Sentencing Reform Act, which expresses several guiding principles designed "to promote justice." Among these are the principle that "[e]very defendant shall be punished by the imposition of a sentence justly deserved in relation to the seriousness of the offense," Tenn. Code Ann. § 40-35-102(1) (2010), and that:

> (2) The sentence imposed should be no greater than that deserved for the offense committed;
> (3) Inequalities in sentences that are unrelated to a purpose of this chapter should be avoided; (4) The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed[.]

Tenn. Code Ann. § 40-35-103(2) - (4) (2010); *see also State v. Moss*, 727 S.W.2d 229, 235 (Tenn. 1986) ("[T]he punishment imposed should fit the crime as well as the offender.").

[20] *See Atkins v. Virginia*, 536 U.S. at 311-12 (noting that the Eighth Amendment's limits on the death penalty are subject to change based on the "evolving standards of decency that mark the progress of a maturing society") (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)).

of the bad." Thus, it would be more appropriate for the reviewing courts to inquire whether the punishment fits the crime, based on whether the case at issue more closely resembles cases that have resulted in the death penalty or those that have not.

The majority of the Court in this case finds it "difficult to make a meaningful comparison between a death penalty case on appeal and other cases in which the death penalty was never sought." We do not see the difficulty. Tenn. Code Ann. § 39-13-206(c)(1)(D) requires reviewing courts to compare cases that involve similar crimes and similar defendants. These factual similarities can be isolated and weighed regardless of how the case was prosecuted. The Court says that "comparing a sentence imposed by a jury to a sentence resulting from a plea agreement is illogical in that the circumstances are not similar." But the circumstances the proportionality statute requires reviewing courts to consider are the circumstances of the crime and the criminal, including the defendant's character, not the circumstances of the procedure that produced the conviction.

The Court also states that broadening the pool of cases considered in a proportionality analysis is "an inappropriate invasion into the independent prosecutorial function." Quite the contrary. Prosecutorial discretion is a cornerstone of Tennessee's criminal justice system. Prosecutors remain entrusted with the responsibility to select the cases in which they will seek the death penalty, consistent with their district's policies and legal culture.

The purpose of proportionality review under Tenn. Code Ann. § 39-13-206(c)(1)(D) is not to determine whether the prosecutor made the appropriate decision.[21] Instead, proportionality review looks at the end result and asks whether the punishment in a particular case, compared to Tennessee's other first-degree murder cases, involves the sort of egregious crime and dangerous criminal that typically warrants capital punishment in Tennessee. A negative answer is in no way a criticism of the decision of the prosecutor. The proportionality review requires the courts to ask a different question than the question facing a prosecutor when deciding whether to pursue the death penalty.[22]

---

[21] We agree fully with the Court's observation that prosecutors should and must have broad protection for their charging decisions. However, notwithstanding its statements requiring respect for this discretion, the Court has left unclear what the full extent of this respect is. It is not readily apparent how conducting a proportionality analysis using a pool of all Rule 12-eligible cases is any less respectful of prosecutorial discretion in general or of the discretion of a particular prosecutor than reversing a death sentence as the Court did in *State v. Godsey*.

[22] Similarly, proportionality review under Tenn. Code Ann. § 39-13-206(c)(1)(D) requires reviewing courts to address a question that is different from the questions the jury must decide. It also requires the courts to make their decision using evidence that the jury does not, and cannot, possess – the information regarding the "similar cases" involving other defendants.

It is not lost on us that there are many reasons why the prosecutor may not seek the death penalty in a particular case. However, proportionality review using a larger pool is not simply an exercise in counting the number of cases in which the death penalty was or was not pursued or in finding a single similar case in which the death penalty was imposed or not imposed or in comparing aggravating and mitigating factors across the cases. Again, the reviewing courts must address whether the defendant and the criminal acts the defendant committed are among the "worst of the bad." Adopting a larger pool and jettisoning the "plainly lacking" standard will give reviewing courts more effective analytical tools for making this determination.

Of course, identifying the "similar cases" from among the myriad Tennessee murder cases is easier said than done. This Court, however, has the benefit of the database prepared and kept in accordance with Tenn. Sup. Ct. R. 12, as well as an excellent team of staff attorneys and law clerks to assist us in this task. We also rely on appellate counsel for the State and for the defendant to present potential "similar cases" – both reported and unreported – for our consideration.

## VI.

This Court's collective "experienced judgment and intuition"[23] prompted us to give Mr. Pruitt's case renewed attention. Accordingly, we invited the parties and others to submit supplemental briefs and to participate in a second oral argument to address whether the proportionality analysis in *State v. Bland* should be modified. In addition to the parties submitting supplemental briefs, the Tennessee Association of Criminal Defense Lawyers and The Constitution Project, the Tennessee Bar Association, the Tennessee Death Penalty Assessment Team, the Tennessee District Attorneys Conference, and the Tennessee District Public Defenders Conference submitted briefs as friends of the Court. We also considered the 2007 ABA Report and the 2004 Comptroller's Report cited in the ABA Report.

After considering these briefs and materials, the Court has decided to continue to employ the *State v. Bland* proportionality analysis and, using that analysis, to uphold Mr. Pruitt's death sentence. Based on the same briefs and materials, we have determined that the proportionality analysis required by Tenn. Code Ann. § 39-13-206(c)(1)(D) should be based on a broader pool of cases – a pool similar to the pool used by this Court from 1977 to 1997. Using this pool of cases, we find that Mr. Pruitt's criminal act is much more similar to crimes that did not result in the death penalty than to crimes that did.

---

[23] *State v. Bland*, 958 S.W.2d at 668.

## A.

We have no quarrel with the Court's description of Mr. Pruitt's personal history or background. We also agree with the Court's description of Mr. Pruitt's criminal acts on August 2, 2005. Mr. Pruitt, a young African-American man with a prior criminal record, set out to steal an automobile. He waited outside a convenience store until he picked out an elderly white stranger, Lawrence Guidroz, as his victim. Mr. Pruitt accosted Mr. Guidroz as he was placing groceries in his automobile. When Mr. Guidroz fought back, Mr. Pruitt hit him repeatedly with his fists, threw Mr. Guidroz to the ground, and then drove away in Mr. Guidroz's car. As the State's brief points out, the entire struggle lasted only fifteen seconds. Mr. Pruitt used no weapon other then his own body, and Mr. Guidroz died in the hospital over a day later from internal injuries. After he learned that his victim had died, Mr. Pruitt turned himself in.[24]

The grand jury indicted Mr. Pruitt for first-degree murder and murder in perpetration of a robbery. However, the jury declined to convict Mr. Pruitt of first-degree murder and instead found him guilty of second-degree murder and murder in the perpetration of a robbery. By convicting Mr. Pruitt of second-degree murder, the jury necessarily determined that Mr. Pruitt "knowingly" killed Mr. Guidroz.[25] However, as borne out by the record, the jury stopped short of finding that Mr. Pruitt accosted Mr. Guidroz with the intent to kill him.[26] Mr. Pruitt's intent was to steal Mr. Guidroz's automobile. The death of Mr. Guidroz was incidental to this robbery.

Thus, for the purpose of identifying the "similar cases" that Tenn. Code Ann. § 39-13-206(c)(1)(D) requires us to weigh, we consider the essence of this case to be that Mr. Pruitt, a young man of limited intellectual ability with a prior criminal record, acting alone, waited for an opportunity to steal an automobile. He selected an elderly stranger as his victim, and when the stranger resisted, Mr. Pruitt struck him repeatedly with his fists and threw him to the ground. The struggle lasted fifteen seconds, and the stranger died approximately one day later from internal injuries. Mr. Pruitt surrendered to the authorities after he learned that his victim had died.

---

[24] This description of the crime is distilled from our consideration of the nine comparison factors for "similar cases" and eight comparison factors for "similar defendants" this Court enumerated in *State v. Bland*, 958 S.W.2d at 667.

[25] Second-degree murder, as it applies to Mr. Pruitt, is defined as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1) (2010).

[26] "'Intentional' refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a) (2010).

# B.

When it conducted its proportionality review in this case, the Court of Criminal Appeals first chose thirteen cases in which the death penalty had been upheld "under similar facts and under [the] application of similar statutory aggravating circumstances."[27] Thereafter, the court added five additional cases that were "based only upon the . . . aggravating circumstance of prior violent felony convictions."[28]

The proportionality review required by Tenn. Code Ann. § 39-13-206(c)(1)(D) is not concerned with merely tallying and matching the seventeen statutory aggravating circumstances. Since every death sentence requires a jury's finding of aggravating circumstances, a reviewing court can almost always find a case supporting affirmance of the death penalty based on a particular aggravating circumstance or combination of aggravating circumstances. Because the Court of Criminal Appeals relied so heavily on simply matching the aggravating circumstances, it is no surprise that the Court's opinion cites only three of the "similar cases" relied upon by the Court of Criminal Appeals.[29]

We now consider the seven cases cited in the Court's opinion as "similar cases" to the one before us now. Five of these seven cases were based upon the "especially heinous" aggravating circumstance in Tenn. Code Ann. § 39-13-204(i)(5). Again, the plain language of Tenn. Code Ann. § 39-13-206(c)(1)(D) requires consideration of "the nature of the crime and the defendant," not the aggravating circumstances. Nevertheless, the presence of the Tenn. Code Ann. § 39-13-204(i)(5) "especially heinous" aggravating circumstance is a significant tip-off that we may well be dealing with one of the "worst of the bad" cases.

Five of the "similar cases" chosen by the Court based on the finding of the Tenn. Code Ann. § 39-13-204(i)(5) aggravating circumstance are, without doubt, among the "worst of the bad." In *State v. Barber*, the defendant broke into an elderly victim's home and smashed her skull with at least five blows from a crescent wrench.[30] In *State v. McNish*, the defendant brutally beat his seventy-year-old victim about the head and face with a glass vase and then

---

[27] Tenn. Code Ann. § 39-13-204(i) (2010) lists seventeen aggravating circumstances that render a first-degree murder death-eligible.

[28] Tenn. Code Ann. § 39-13-204(i)(2) identifies as an aggravating circumstance that "[t]he defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person."

[29] *State v. Barber*, 753 S.W.2d 659 (Tenn. 1988); *State v. McNish*, 727 S.W.2d 490 (Tenn. 1987); and *State v. Barnes*, 703 S.W.2d 611 (Tenn. 1985).

[30] *State v. Barber*, 753 S.W.2d at 660.

attempted to frame two of his acquaintances for the killing.[31]  In *State v. Barnes*, the defendant, drunk on Lysol, barged into his elderly victim's house and beat her so violently that he fractured her nose and jaw and left her with her eyes swollen shut and multiple bruises about her entire body.  The defendant also cut the victim's telephone line to prevent her from calling for help.[32]  In *State v. Cone*, the defendant, while fleeing from the police, broke into an elderly couple's home, killed the couple, and mutilated their bodies.[33]  Finally, in *State v. Campbell*, the defendant lured his elderly victim into the woods and fractured the victim's skull by striking it with a rock at least eight times.[34]

The facts of these cases plainly reflect the sort of savagery that warrants the death penalty.  They clearly evidence a dangerous defendant with a depraved mind and an intent to kill.  In the words of Tenn. Code Ann. § 39-13-204(i)(5), these murders were "especially heinous, atrocious, [and] cruel," and the violence visited on the victims was far "beyond that necessary to produce death."  The same cannot be said for Mr. Pruitt's actions during the fateful fifteen seconds on August 2, 2005.  While every murder, including the murder of Mr. Guidroz, is a serious crime that warrants rigorous punishment, Mr. Pruitt's acts do not reflect the same savagery and cruelty evident in these five cases.

In addition to these five cases, the Court relies on two other cases that do not involve the aggravating circumstance in Tenn. Code Ann. § 39-13-204(i)(5).  In *State v. Johnson*, the defendant, while on parole from a second-degree murder conviction, fractured his victim's skull by striking him twice with a heavy glass candlestick after the victim refused to return two stolen rifles that the defendant had pawned to him.[35]

In *State v. Smith*, the defendant, armed with a handgun, attempted to rob his elderly victim while the victim was walking home with his groceries.  When the victim fought back, the defendant shot him twice, leaving the victim "lying helpless and bleeding on the sidewalk."[36]  In affirming the death penalty, the majority of the Court observed that the record contained "hardly any suggestion of mitigating factors which could possibly outweigh

---

[31] *State v. McNish*, 727 S.W.2d at 491, 493.

[32] *State v. Barnes*, 703 S.W.2d at 612-13.

[33] *State v. Cone*, 665 S.W.2d 87, 90 (Tenn. 1984).

[34] *State v. Campbell*, 664 S.W.2d 281, 282 (Tenn. 1984).

[35] *State v. Johnson*, 698 S.W.2d 631, 632 (Tenn. 1985).  Two members of the Court, after considering "all of the circumstances of this crime, especially the indications that the decision to kill was made on 'the spur of the moment,'" determined that the death sentence should be set aside and that the defendant should receive a life sentence.  *State v. Johnson*, 698 S.W.2d at 634.

[36] *State v. Smith*, 695 S.W.2d 954, 956 (Tenn. 1985).

the outrageous and totally antisocial behavior of the accused in committing this shocking homicide." *State v. Smith*, 695 S.W.2d at 960.

In our opinion, there are significant factual differences between the crimes committed in *State v. Johnson* and *State v. Smith* and the crime for which Mr. Pruitt stands convicted in this case. In both of the cited cases, the defendants used a weapon, while Mr. Pruitt did not. In addition, Mr. Pruitt surrendered to authorities when he learned that his victim had died, unlike Messrs. Johnson and Smith. The only similarities between these two cases and Mr. Pruitt's case are that the victims were elderly and the killings were committed in the course of a robbery. This is little more than saying that the cases have similar aggravating factors.

Only one of the Court's comparison cases, *State v. Barnes*, involved a beating by human fists. Mr. Barnes was a derelict, drunk on Lysol, who robbed an elderly woman to buy money for Kool-Aid to mix with his Lysol. He barged into his victim's house and beat her so violently that he cut open the skin on his own knuckles.[37] Then, leaving his victim severely bloodied with her eyes swollen shut and a fractured nose and jaw, the defendant cut the telephone lines to prevent the victim from calling for help.[38] The jury found the killing "especially heinous, atrocious, or cruel" under the Tenn. Code Ann. § 39-13-204(i)(5) aggravating circumstance. Mr. Pruitt's brief struggle with his victim, in a public place, that culminated in body-slamming him to the ground, is factually distinguishable from the protracted beating Mr. Barnes unleashed on his elderly victim.

In addition to examining the "similar cases" relied upon by the Court in this case, it is appropriate to examine the cases the Court chose not to consider. The first is a weaponless felony murder case in which the jury rejected the death penalty. *State v. Walden*, No. 03C01-9707-CR-00317, 1998 WL 389062 (Tenn. Crim. App. July 14, 1998), *perm. app. denied* (Tenn. Jan. 25, 1999) (No Rule 12 report available). Mr. Walden, his victim, and two others were out cruising. The victim was intoxicated. After Mr. Walden stopped the car to enable the victim to relieve himself, Mr. Walden and perhaps another occupant of the car stomped on the victim's head and stole his wallet. Then they placed the victim in his own car and rolled the car into a lake.[39] Mr. Walden was indicted for premeditated first-degree murder, felony murder, and other charges.[40] The jury convicted Mr. Walden of felony murder and sentenced him to life imprisonment. The facts of Mr. Walden's case are more savage and

---

[37] *State v. Barnes*, 703 S.W.2d at 613.

[38] *State v. Barnes*, 703 S.W.2d at 611, 613.

[39] *State v. Walden*, 1998 WL 389062, at *1.

[40] Before Mr. Walden's trial, his accomplice pleaded guilty to second-degree murder, aggravated kidnapping, and aggravated robbery. The court imposed an effective sentence of eighty years.

heinous than Mr. Pruitt's because of manner in which the killers callously treated the victim and attempted to hide their crime – conduct evidencing an intent to kill.

The Court also could have compared the facts of Mr. Pruitt's case with the facts of *State v. Godsey*, the only death penalty case since 1997 in which the Court determined under Tenn. Code Ann. § 39-13-206(c)(1)(D) that the death penalty was disproportionate. Mr. Godsey was convicted of felony murder for throwing a seven-month-old baby on the floor because he was irritated by the child's crying. *State v. Godsey*, 60 S.W.3d at 767. Like the present case, Mr. Godsey used no weapons and cooperated with the law enforcement authorities, and the violent acts were spontaneous and of a brief duration. Like Mr. Pruitt, Mr. Godsey "offered a great deal of proof [in mitigation] about his unstable childhood in a poor, dysfunctional family." *State v. Godsey*, 60 S.W.3d at 790-92. In these important respects, the crime and criminal in *State v. Godsey* are "similar" to the crime and criminal in this case, yet this Court determined unanimously that the death sentence imposed on Mr. Godsey by the jury was disproportionate under Tenn. Code Ann. § 39-13-206(c)(1)(D).

In conclusion, all of the majority's comparison cases, each dating back to the 1980s, are more savage and barbarous than the fatal carjacking incident involved in this case. Instead, this case is more similar to *Walden*, in which the jury rejected the death penalty, and to *Godsey*, in which this Court unanimously found the death penalty disproportionate. Even the cases in the *Bland* pool suggest Mr. Pruitt's sentence should be reduced to life without parole.

## C.

Examining "similar cases" beyond the restricted pool of cases required by *State v. Bland* reinforces our conclusion that Mr. Pruitt's sentence of death is "disproportionate . . . considering both the nature of the crime and the defendant."

In *State v. Threat*, the defendant knocked down his elderly victim and stole her purse. The victim died from injuries sustained in the fall. *State v. Threat*, No. W2005-02813-CCA-R3-CD, 2007 WL 2284816, at *5 (Tenn. Crim. App. Aug. 8, 2007), *perm. app. denied* (Tenn. Dec. 17, 2007). The jury convicted the defendant of first-degree felony murder and aggravated robbery, and the defendant was sentenced to concurrent sentences of life and twelve years. In a similar case in which the elderly victim died after the defendant knocked her down and stole the contents of her purse, the jury convicted the defendant of first-degree murder, and the defendant received a life sentence. *State v. Pruitt*, No. 85-117-III, 1986 WL 873, at *1 (Tenn. Crim. App. Jan. 17, 1986), *perm. app. denied* (Tenn. Mar. 24, 1986).

In *State v. Davis*, the defendant approached his eighty-five-year-old victim and requested change for a five dollar bill. When the victim removed his wallet, the defendant punched him in the face, grabbed his wallet, and fled. *State v. Davis*, No. W2003-02362-

CCA-R3-CD, 2005 WL 452569, at *1 (Tenn. Crim. App. Feb. 24, 2005), *perm. app. denied* (Tenn. Aug. 22, 2005). The victim's injury caused him to die three days later. The defendant was convicted of felony murder and aggravated robbery and was sentenced to life without the possibility of parole. Similarly, in *State v. Sepulveda*, the defendant broke into the home of his ninety-five-year-old victim, knocked her to the floor, choked and kicked her, and stole her medicine. *State v. Sepulveda*, No. 03C01-9402-CR-00069, 1997 WL 351107, at *8-9 (Tenn. Crim. App. June 26, 1997), *perm. app. denied* (Tenn. Mar. 2, 1998). The victim died twelve weeks later. The jury convicted the defendant of felony murder, especially aggravated robbery, and theft, and the defendant was sentenced to life plus ten years.

In *State v. Jenkins*, the defendant and two other men were cruising. The victim was intoxicated. When the car stopped, the defendant and one of the occupants in the car beat the other occupant, stole his clothes, pants, and money, and left the victim unconscious in a vacant lot. The assailants used the victim's money to purchase cocaine. *State v. Jenkins*, 845 S.W.2d 787, 788 (Tenn. Crim. App. 1992), *perm. app. denied* (Tenn. Oct. 26, 1992). A jury convicted the defendant of felony murder and robbery, and the defendant was sentenced to life plus three years.

Mr. Pruitt's counsel directs our attention to *State v. Honea*, No. M2009-01500-CCA-R3-CD, 2011 WL 332553 (Tenn. Crim. App. Jan. 28, 2011), *perm. app. denied* (May 31, 2011). In *State v. Honea*, the defendant, who had a record of violent felony convictions, broke into the home of a ninety-two-year-old widow, shot her twice, and stole her car. The victim's body was later discovered buried under some saplings and scavenged by animals. A jury found the defendant guilty of premeditated first-degree murder, felony murder, especially aggravated kidnapping, aggravated burglary, evading arrest, and unlawfully possessing a handgun. The defendant was sentenced to life without parole.

Counsel also directs our attention to *State v. Carter*, No. E2005-01282-CCA-R3-CD, 2007 WL 1515010 (Tenn. Crim. App. May 24, 2007), *perm. app. denied* (Tenn. Aug. 13, 2007). In this case, the defendant and his victim were intoxicated and got into a fight. The defendant stomped on the victim's throat and bludgeoned him twenty-two times in the head with a wrench, leaving the victim's face "caved in" and his entire head "grossly deformed."[41] The defendant then stole some of the victim's possessions. The jury convicted the defendant of first-degree premeditated murder, felony murder, and especially aggravated robbery, and the defendant was sentenced to life without parole plus forty years.

It is beyond reasoned argument that each of these crimes resulted in the death of the victim. The fact the prosecutors did not seek the death penalty in each of these cases does not undermine the fact that each of these killings were atrocious and cruel. Nor does it

---

[41] *State v. Carter*, 2007 WL 1515010, at *4.

depreciate the inestimable value of the lives that were senselessly lost. However, the verdicts and sentences in each of these cases reflect that Tennessee's criminal justice system determined that a punishment short of the death penalty was proportionate.

## VII.

Twenty-five years ago, this Court observed that "there can be no perfect procedure for deciding in which cases governmental authority should be used to impose death." *State v. Barber*, 753 S.W.2d at 666 (quoting *Zant v. Stephens*, 462 U.S. 862, 884 (1983)). Under current law, this Court must determine whether "[t]he sentence of death is excessive or disproportionate to the penalty imposed in similar cases," and we must do so by "considering both the nature of the crime and the defendant." Stated another way, the purpose of proportionality review is to determine whether a particular defendant and the crime the defendant has committed are among the "worst of the bad" in Tennessee's experience.

We respect the decisions of both the prosecutor and the jury in this case. It is not our role to second-guess these decisions. However, Tenn. Code Ann. § 39-13-206(c)(1)(D) requires this Court to fairly and objectively compare the crime and the criminal involved in this case with the crimes and criminals in similar cases to ensure that the death penalty is reserved for the "worst of the bad" offenders. While we abhor Mr. Pruitt's senseless killing of Mr. Guidroz, after considering both the "nature of the crime and the defendant" and considering the "similar cases" without the statutorily inappropriate limitations imposed by *State v. Bland*, we have determined that the death penalty – the State's most drastic punishment – does not fit Mr. Pruitt's crime.

Accordingly, we concur with the Court's decision to uphold Mr. Pruitt's conviction for first-degree felony murder. However, after considering the nature of the crime, the defendant, and his prior criminal record and after considering this case in the context of truly similar cases, we conclude that sentencing Mr. Pruitt to life without parole is an appropriate and proportionate punishment.

_____     _____
WILLIAM C. KOCH JR., JUSTICE       SHARON G. LEE, JUSTICE